**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 11-CV-24110-LENARD/O'SULLIVAN**

**MPS ENTERTAINMENT, LLC, a**
**New Jersey Limited Liability Company,**
**and MICHAEL P. SORRENTINO,**
**an individual,**

       **Plaintiffs,**

**vs.**

**ABERCROMBIE & FITCH STORES,**
**INC., and ABERCROMBIE & FITCH, CO.**

       **Defendants.**

_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**SECOND AMENDED COMPLAINT [DE 72]**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

   I.  Factual Background ............................................................................................ 1

   II.  Procedural Background ................................................................................. 3

ARGUMENT AND CITATION OF AUTHORITY ................................................. 4

   I.  Legal Standard Governing A Rule 12 (b) (6) Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted ............................................................. 4

   II.  Plaintiffs Have Established (with their Pleadings) A Prima Facie Case Of Trademark Infringement, Unfair Competition And False Designation Of Origin Under Section 43(A) Of The Lanham Act, As Well As Under Section 495 of The Florida Statutes and the Common Law. ....................................................................................................... 5

    A.  Plaintiffs have prior enforceable trademark rights in the Mark "The Situation." and Defendants commercial speech is not protected by the 1st Amendment ……………………………………………………………………………..5

    B.  Defendants' use of "The Fitchuation" likely caused confusion with Plaintiff's Mark, "The Situation."……………………………………………..…………………7

    C.  Irrespective of the likelihood of confusion with "The Fitchuation," Plaintiffs deserve common law trademark rights in "The Situation." which cannot be resolved at this stage of the case ................................................................................................. 9

    D. Defendants use of "the Situation" Mark cannot be determined to be fair use/parody at this stage of the case……………………………………………...……..…………… 10

    E. Defendants use cannot be determined to be non actionable, non trademark ornamental use at this stage of the case …………………………………………………………11

    F. Defendants are not entitled to 1st Amendment protections because its use of the Mark "the Situation" in the Press Release is a commercial use………………………….……………11

   III.  Plaintiffs have adequately stated a claim for false advertising under the Lanham Act and under Florida State Law…………………………………………………………11

   IV. Plaintiffs have adequately pled the elements of an unfair competition and dilution claim.12

   V. Plaintiffs have adequately stated a claim for injury to business reputation……………….13

   VI.  Plaintiffs have adequately stated a claim for violations of  Fla. Stat. 540.08................. 123

A.  Defendants' use of Sorrentino's name and likeness in their  Press Release, (was designed to and did in fact, directly promote Defendant's products), was for a "commercial" or "advertisement" purpose under § 540.08 which is not protected by the 1st Amendment…. ……………………………………………………………………………………………14

B.   Defendants' Press Release did not constitute a "bona fide" news report because it was published for advertisement purposes and because Defendants are not a news medium as defined by F.S. 540.08 (3) (a). ........................................................................................... 16

1.   Defendants' Press Release could not constitute a bona fide news report, having a legitimate public interest which Defendants created and because Defendants' alleged offer to Sorrentino was a fabrication. ............................................................................ 18

2.  Even if Defendants' letter intended to convey their offer to Sorrentino (through MTV), the Press Release  exposes Defendants' actionable commercial use of Sorrentino's name…………………………………………………………………………………………19

VI.   Plaintiffs have adequately stated a claim for common law misappropriation. ................ 19

VII. Plaintiffs have adequately pled the elements of a violation of Fla. Stat. § 817.41…........... 19

**CONCLUSION** ............................................................................................................... **19**

# TABLE OF AUTHORITIES

### CASES

*Anderson v. Upper Keys Business Group, Inc., et al.* 61 So.3d 1162 (Fla. 3d DCA 2011)...…..5,6

*Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)--------------------------16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ------------------------------------------------- 5

*Bitancur v. Florida,* 2008 WL 506305L (N.D. Fla. 2008)………………………………………………………………………………………………. 8

*Bosley Med Dist. v. Kremer* 403 F 3d (9th Cir 2005) …………………………………………………………………………………………………………11

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)  ---------------------------------------10

*Chen v. Cayman Arts*, 755 F. Supp. 2d 1294 (S.D. Fla. 2011) ----------------------------------- 10,13

*Cummings v. Sony Music,* 2003 U.S. Dist. Lexis 15007, 16 (S.D.N.Y 2003); ……………………………………………………………………………*12*

*Custom Mfg. and Eng's, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018 (11th Cir. 1990)---------- 5

*Daly v. Hippo Golf Company, Inc.*, 646 F. Supp. 2d 1347 (S.D. Fla. 2009) -----------------------15

*Faulkner Press, L.L. C. v. Class Notes, L.L.C.*, 756 F.Supp.2d 1352 (N.D.Fla.2010)………..…14

*Frehling Enters. v. Int'l Select Group, Inc.,* 192 F.3d 1330 (11th Cir.1999) ------------------------ 7

*Gen. Conference Corp. of Seventh Day Adventists v. Perez*, 97 F. Supp. 2d 1154 (S.D. Fla. 2000) ------------------------------------------------------------------------------------------------------ 6, 7

*Goldberg v. Ideal Publishing Corp.*, 210 N.Y.S. 2d 928 (Sup. Ct. N.Y. Cty. 1960) --------------18

*Great S. Bank v. First S. Bank*, 625 So. 2d 463 (Fla. 1993)---------------------------------------------- 6

*Gritzke v M.R.A. Holdings, LLC*, 2002 US Dist. Lexis 28085 (N.D. Fla. 2002)  -------------- 10, 12

*Harper & Row, Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 560 (1985) …………………10

*Hensley Mfg. v. Pro Pride Inc.,* 579 F3d. 603, 611 (6th Cir 2009)…………………………………..8

*Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519 (11th Cir. 1991) ----------------- 5

*Jackam v. Hospital Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577 (11th Cir. 1986) ------------------- 5

*Jackson v Grupo Industrial Hotelero*, 2009 Us Dist. Lexis 116770 (S.D. Fla. 2009)………...…14

*Jordan Int'l, Inc. v. United Indus. Sales Org., Inc.*, 699 F. Supp. 268 (S.D. Fla. 1988) ----------- 6

*Lane v. MRA Holdings*, 242 F. Supp. 2d 1205 (M.D. Fla. 2002)……………………………12,15

*Loft v. Fuller,* 408 So. 2d 619 (Fla. 4th DCA 1981) ……………………….……………10, 13,14,15

Marvel Enters., Inc. v. NCSoft Corp., 74 U.S.P.Q. 2d 1303 (C.D. Cal.
2005)……………………………………………………………………9

*Messenger v. Gruner*, 94. N.Y 2d 436 (N.Y. 2000) ------------------------------------------------------15

*Molony v. Boy Comics Publishing, Inc.*, 277 App. Div. 166 (1st Dept. 1950) ----------------------18

*Montclair v. Ramsdell*, 107 U.S. 147 (1883) -----------------------------------------------------------------16

*Nottage v. American Express Co.,* 452 So. 2d 1066 (Fla. 3d DCA 1984) ----------------------------13

*Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir.2001) ---------------------- 5

*Scientific Applications, Inc. v. Energy Conservation Corp. of America*, 436 F. Supp. 354
(N.D.Ga.1977) ------------------------------------------------------------------------------------------------ 6

*Solano v. Playgirl, Inc.,* 292 F. 3d 1078, 1089 (9th Cir. 2002) -------------------------------------14

Sony Corp of America v Universal City Studios 104 S. Ct 77………………………………..10

*Spahn v. Julian Messner, Inc.*, 21 N.Y. 2d 124 (N.Y. 1967)…………………………………..……8

*Sun International Bahamas, Ltd. v. Wagner,* 758 So.2d 1190 (Fla. 3d DCA 2000)……………13
*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1275 (11th Cir. 2001) -------------------- 9

*Sutton v. Hearst Corp.*, 277 App. Div. 155 (1th Dept. 1950) ------------------------------------------18

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)) --------------------------------------------------- 5

*Sweet v. City of Chi.*, 953 F.Supp 225, 231 (N.D. Ill.
1996)……………………………………………………………………………….8

*Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275 (11th Cir. 2005) --------------------------------- 5

*Toho Co. v. Sears Roebuck,* 645 F2d 788, 790 (9th Cir 1981),…………………….….……………7

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992). ……………………….………12

*Tyne v. Time Warner Ent. Co.,* 901 S.2d 802 (2005)…………………………………….11, 13,14,15

*Univ. of Ala Bd of Trs v. New Life Act* 2012 WL 2076691 (11th Cir 2012),……………………..11

*Valentine v. C.B.S., Inc.*, 698 F. 2d. 430 (11th Cir. 1983)------------------------------------------------14

*Weinstein Design Group v. Fielder*, 884 So.2d 990 (Fla. 4th DCA 2004)………..10, 13, 14,16,17

S<small>TATUTES</small>

15 U.S.C. § 1052 ------------------------------------------------------------------------------------------------ 7

15 U.S.C. § 1052(e)……………………………………………………………………………..6,9

15 U.S.C. § 1057(b). ----------------------------------------------------------------- 8, 9

Fla. Stat. § 495.061(1) ------------------------------------------------------------------ 9

Fla. Stat. § 495.181------------------------------------------------------------------ 5, 6

Fla.Stat. § 540.08**...............................................................**13,14,15,16,19

NY Civil rights sec 50,51………………………………………………………………..18

Other Authorities
*Black's Law Dictionary, 9th Edition,* 2009 -------------------------------------------------16

<u>Treatises</u>

Restatement (Third) of Unfair Competition ------------------------------------------------ 7

Plaintiffs, MPS ENTERTAINMENT, LLC ("MPS") and Michael P. Sorrentino ("Sorrentino") (collectively "Plaintiffs"), by and through counsel, file this response in opposition to Defendants, Abercrombie & Fitch Stores, Inc.'s and Abercrombie & Fitch Co.'s (collectively "Abercrombie" and/or "Defendants"), Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Motion") (DE 72), and, in support thereof, state as follows:

## INTRODUCTION

### I.      Factual Background

Sorrentino is an internationally known TV star who has appeared on MTV's hit reality show "Jersey Shore," and on other internationally televised programs, such as "Dancing with the Stars" and "The Tonight Show with Jay Leno." (DE 68 ¶4). Defendants' Motion both ignores and disputes Plaintiffs' clear factual pleadings and it asks the Court to consider their interpretation of new facts (that are outside of the pleadings of the Second Amended Complaint).

Sorrentino has used his notoriety and celebrity status to endorse and promote a variety of commercial goods and services using the trademark "The Situation" to designate his entertainment services and his products. (DE 68 ¶3, 4, 8, 11, & 13).

MPS was formed in 2009 for the purpose of engaging in the business of developing, marketing and distributing goods and services under trademarks made popular by Sorrentino. The most popular trademark that Sorrentino has developed, exploited and registered is "The Situation". Since 2009, Sorrentino has used the mark "The Situation" ("the Mark") on apparel (including t-shirts), for entertainment services and on many other products. Sorrentino is internationally known as "The Situation" and "Mike the Situation". (DE 68 ¶3, 4, 8, 11, & 13). Sorrentino has filed numerous registrations for the mark "The Situation", which are in various stages of the United States Patent and Trademark Office (USPTO) registration process. One of those applications (registration number 3635203) of a specific design of the mark "Situation" for use on clothing has received a final registration. Those applications, the international recognition and the registration further demonstrate the common law strength of Sorrentino's mark. Sorrentino has granted MPS the exclusive right to license and otherwise use the Mark in commerce, per the specific international classes identified by the USPTO. Plaintiffs have spent substantial time, energy, and money to develop the goodwill associated with the Mark. (DE 68

¶3, 8, 9, 10, 11 & 35).  As recent relevant examples of Plaintiffs' efforts to protect the Mark, two courts in this district entered orders permanently restraining the defendants (in those cases) from using the Mark.  *See MPS Entertainment, LLC v. GTL Fuel, LLC*, case no. 1:2011-cv-23758 and *MPS Entertainment LLC v. Fletcher et al*, case no. 1:2011-cv-21765.

Starting in 2010 and following the huge success of "Jersey Shore", Defendants began to market and distribute t-shirts containing obvious references to the Mark.  One of these t-shirts reads "The Fitchuation" ("Abercrombie's t-shirt").  Abercrombie's t-shirt bears a mark virtually identical to MPS' Mark.  Defendants' use of the Mark obviously intended to create a false association between Sorrentino and Defendants. (DE 68 ¶13, 28, 29, 30, 36, 44, 48, 50 & 61). Further, the registration date for the Mark under registration number 3635203 pre-dates the sale of Abercrombie's t-shirt.

In August of 2011, Defendants issued what they have termed a "press release" as part of an international advertising campaign, using Sorrentino's name and the Mark  in order to create enormous public awareness, notoriety and publicity of its' brand, its' stores, its' products and its' e-commerce web sites. (DE 68 Ex. B). (The "Press Release")  The face of the Press Release promotes the stores operated by Defendants and it directs viewers to the web addresses of their e-commerce sites, where Defendants sell their branded products.  The engine that drove the huge publicity and marketing campaign that was intended (and did in fact follow), was the use of Plaintiff's name and the Mark. (DE 68 ¶14, 15, 33, & 57 and Ex. B).

On August 12, 2011,[1] Defendants embarked on this global advertising campaign, using Sorrentino's name and the Mark to enhance brand awareness for its products by falsely claiming that Abercrombie had offered money to Sorrentino to stop wearing their goods. Sorrentino was humiliated and demeaned as a result of Abercrombie's advertising campaign. Abercrombie disseminated the Press Release among all major news distribution outlets and to other news mediums.  Defendants also published the Press Release on their website and on their official Facebook page (hereafter, "the Facebook Post"). At no time, did Sorrentino, or anybody acting on his behalf, give implied or express permission to Defendants to use Sorrentino's name and/or his Mark in commerce.  Abercrombie used Plaintiff's Mark three times in the Press Release in

---

[1]  Abercrombie claims in its' Motion (DE 72, at FN 2) that the Press Release, which was dated on its face August 12, 2011, was not actually released until August 16, 2011.  Clearly, this is an issue of (a minor) contested fact, and outside of the allegations of the Complaint, which is only relevant to demonstrate on August 12, 2011 (as it states on its face) or on August 16, 2011 (as Defendants now claim) is of no consequence to any of the claims as pled.

order to create the international publicity and vast distribution of their advertising campaign that followed.  However, there are six false statements in the Press Release. (DE 68  ¶17, 18, 19, 20, 21, 22, 23, 24, 49, 50, 60).

On August 15, 2011, Abercrombie wrote to a representative of MTV (the network that distributes the "Jersey Shore") and stated that they "were <u>willing</u> to offer <u>up to</u> $10,000.00 to MTV, the show's producers <u>or</u> the cast members if Sorrentino would stop wearing "Abercrombie" brand clothing" The letter is attached to the Motion to Dismiss. (DE 72-1) ("Defendants' Letter").  Defendants' Letter is intentionally vague and it is not a valid, nor legal offer (in a contractual sense) and Abercrombie has <u>never</u>  made any offer to Sorrentino, as the Press Release falsely states.  (DE 68 ¶25 & 26).

As a predictable (and intended) result of Defendants' false and deceptive advertising campaign, more than 1,000 members of the press wrote stories about the Press Release, referencing and quoting the Press Release in hundreds of newspapers and Internet blogs as part of stories about Defendants' products, stores and their brand. (DE 68 ¶31, 32, 56, 57, 61 & 63).

Defendants' advertising and publicity campaign was intentionally designed and orchestrated to create consumer awareness of Defendants' goods, its e-commerce web sites as well as to create corporate publicity and designed to promote and advertise Abercrombie's specific stores, its' brand and its' products, which was worth tens of millions of dollars to Abercrombie and which could not have been accomplished without the exploitation of Sorrentino's name and the Mark.  Indeed, had Defendants made an unknown person the object of its' Press Release, (instead of Sorrentino) no publicity or press reports would have followed. (DE 68 ¶27, 32, 33, 56, 57 & 63).

## II.    Procedural background

1. On November 15, 2011, Plaintiffs filed and served their Verified Complaint and Demand for Jury Trial, against Defendant, Abercrombie & Fitch Stores, Inc.

2. On June 15, 2012, Plaintiffs filed their Second Amended Complaint and Demand for Jury Trial (DE 68), against both Defendants for: (1) Trademark Infringement Under Common Law; (2) Unfair Competition and False Designation of Origin-15 U.S.C. 1125(a); (3) False Advertising in Violation of 15 U.S.C. SEC. 1225(a); (4) Unfair Competition Under Florida Statutes 495.151; (5) Deceptive, False and Misleading Advertising-Florida Statutes 495.151; (6) Common Law Injury to Business Reputation; (7) Violation of F.S. 540.08; (8) Illegal Use of

Sorrentino's Name in Commerce; and (9) Deceptive, False and Misleading Advertising, Florida Statutes §817.41. (DE-68).

    3. On June 29, 2012 Defendants filed their Motion and Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted. (DE-72) (The "Motion").

## ARGUMENT AND CITATION OF AUTHORITY

### III.  Legal Standard Governing A Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

    In an ordinary civil action such as this one, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2). "A judge ruling on a defendant's Rule 12(b)(6) motion to dismiss a complaint 'must accept as true all of the factual allegations contained in the complaint,'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 (2002)), and "must accept all reasonable inferences therefrom." *Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1288 n. 12 (11th Cir. 2005). The standard, designed to encourage brevity, does not require "detailed factual allegations," *Twombly*, 550 U.S. at 555, but simply requires that the non-moving party show factual allegations which, accepted as true, "state a claim to relief that is plausible on its face." *Id*. at 570. The standard is not whether the plaintiff will ultimately prevail on his theory, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. *See Jackam v. Hospital Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986). As such, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For purposes of a rule 12(b)(6) motion, the complaint must be viewed in the light most favorable to the plaintiff and all allegations must taken as true.   Thus, in a complaint for common law trademark and unfair competition infringement, the court must accept a pleading that plaintiff has protectable rights in the mark and that use of that trademark in commerce is deemed to be unfair competition.   *Benard Industries, Inc. v. Bayer,* 1996 U.S. Dist. LEXIS 15622 (S.D. Fla. 1996).

IV.    **Plaintiffs Have Established (with their Pleading) a Prima Facie Case Of Trademark Infringement, Unfair Competition and False Designation Of Origin Under Section 43(A) Of The Lanham Act, as Well As Under Florida Statute 495 and the Common Law.**

The analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the Lanham Act. *Investacorp, Inc. v. Arabian Inv. Banking Corp.,* 931 F.2d 1519, 1521 (11th Cir. 1991). Section 495.181, Florida Statutes, states that "[t]he intent of this chapter is to provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration…" and, "[t]o that end, the construction given the federal act should be examined as persuasive authority for interpreting and construing this chapter." Fla. Stat. § 495.181. Accordingly, "courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n. 4 (11th Cir.2001). ("The intent of this chapter is to provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, as amended."); *Gen. Conference Corp. of Seventh Day Adventists v. Perez*, 97 F. Supp. 2d 1154, 1157 (S.D. Fla. 2000). As Defendants concede, the inquiry in the present case thus collapses into a single analysis of federal law. [DE-72 at p.14]

The requirements necessary to establish a prima facie case under § 1125(a) takes the form of a two-pronged test. First, "a plaintiff must show that he had enforceable trademark rights in the mark or name," and, second, he must show "that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'" *Custom Mfg. and Eng's, Inc. v. Coast Cmty. Coll. Dist.,* 889 F.2d 1018, 1022 (11th Cir. 1990). Defendants' misrepresentation of the pertinent facts in the Motion renders their ensuing analysis patently incorrect, as Plaintiffs' have properly pled each of the necessary elements.

**A.  Plaintiffs have prior enforceable trademark rights in the Mark "The Situation" and Defendants' commercial speech is not protected by the 1st Amendment.**

Plaintiffs' pleadings, its numerous trademark applications (which have not been challenged) and registration number 3635203 for the mark "The Situation" establishes Plaintiffs enforceable interest in the Mark "The Situation", that the Defendants have made unauthorized

use of it and that consumers are likely to be confused.  Defendants prematurely ask this Court to determine (without any evidence) and as a matter of law, that Plaintiffs do not have a protectable interest in the Mark "The Situation". *Anderson v. Upper Keys Business Group, Inc., et al.,* 61 So.3d 1162, 1167 (Fla. 3d DCA 2011); *see also* § 495.181, Fla. Stat. (2008). Defendants' allegations about the status of Plaintiffs' registrations of the Mark are simply irrelevant to Plaintiffs' common law and statutory claims because federal registration of a trademark is not a prerequisite to an infringement action.  *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992).  (A mark that is not federally registered may be protected and considered registered under the Lanham Act if it is distinctive). 15 U.S.C. § 1052; *Great S. Bank v. First S. Bank*, 625 So. 2d 463, 467 (Fla. 1993).  A mark is <u>inherently distinctive</u> if it is: (1) suggestive; or (2) arbitrary or fanciful. *Anderson*, 61 So.3d at 1168-169.[2] Plaintiffs have adequately pled the basis of a distinctive, if not a famous mark.

Defendants ask this Court to ignore the pleadings and to make a determination as to the strength of Plaintiffs' Mark absent any evidence. However, for the Court to consider this factual issue (which is well outside of the allegations of the Second Amended Complaint), the Court must consider evidence of the strength of Plaintiffs' "The Situation" Mark.  A trademark's registration on the Principal Register pursuant to 15 U.S.C. Section 1051 is prima facie evidence of the mark's validity. 15 U.S.C. § 1057(b);  *Jordan Int'l, Inc. v. United Indus. Sales Org., Inc.*, 699 F. Supp. 268, 270 (S.D. Fla. 1988); § 495.061(1), Fla. Stat.

Plaintiffs' own a federally registered mark for the trademark "The Situation" for use on clothing (U.S. Registration No. 3635203) which is prima facie evidence of the Mark's validity.  As such, Defendants' elaborate (yet unsupported) analysis is superfluous and misplaced, and consequently, the first prong of the test is easily met. *Scientific Applications, Inc. v. Energy Conservation Corp. of America*, 436 F. Supp. 354, 360 (N.D.Ga.1977) ("Although the threshold question in any infringement action is whether the mark is registrable, plaintiffs' registration

---

[2] The Florida Supreme Court has defined "arbitrary" marks as follows: "'Fanciful' marks consist of "coined" words that have been invented or selected for the sole purpose of functioning as a trademark. Such marks comprise words that are either totally unknown in the language or are completely out of common usage at the time, as with obsolete or scientific terms....If, in the process of selecting a new mark, a seller sits down and invents a totally new and unique combination of letters or symbols that results in a mark that has no prior use in the language, then the result is a 'coined' or 'fanciful' mark." *Great S. Bank v. First S. Bank*, 625 So.2d 463, 467 (Fla.1993). The "Situation" mark was completely out of common usage at the time that Plaintiffs began to use the Mark on a variety of commercial products (except by a store in Memphis) whose mark has been acquired by Plaintiffs' see registration no.3.635.203. The mark the "Situation" for purposes of clothing and entertainment services satisfies the definition of a "coined" or "fanciful" mark under the Florida Supreme Court's articulation, above.  As a fanciful mark, "The Situation" mark is inherently distinctive. Further, "[T]rademarks that are fanciful or arbitrary are more distinctive than those that are suggestive, and suggestive marks are more distinctive than those that are descriptive, [or] geographically descriptive…" *See* Restatement (Third) of Unfair Competition § 21, cmt. i (Tent. Draft No. 2, 1990).  Since the "Situation" Mark is in the category of marks considered "most distinctive" it deserves protection under the Lanham Act.

enjoys a strong presumption of validity"); 15 U.S.C. §§ 1052(e), 1057(b).  Defendants'
unsupported allegation that the Mark "The Situation" is merely Michael Sorrentino's
"nickname", as opposed to his protectable mark is insufficient, as a matter of law, to overcome
the presumption in Plaintiffs' favor.  Defendants' citations to cases that discuss the enforceability
of underline personal names likewise miss the mark, because Plaintiffs have adequately pled the existence
of secondary meaning in the minds of consumers who associate the Mark "The Situation" with
Michael Sorrentino.  Indeed, a Google search of "The Situation" will yield millions of stories
about and references to Michael Sorrentino.  (DE 68 ¶3,4,5,8,10,11,14,68).  In regards to this
issue, Plaintiffs will present extensive evidence of the Mark being famous (including admissions
by Defendants) at the appropriate time (at trial).

**B. Defendants' use of "Fitchuation" likely caused confusion with Plaintiffs' Mark, "The Situation."**

Plaintiffs have adequately pled that Defendants' use of the Mark likely caused consumer
confusion.  (DE 68  ¶14,15,16,17,28,29,33,36,40,48,49,50,51,53,56,61,64,73).   The Eleventh
Circuit has approved the following seven factors to determine the likelihood of confusion: (1)
type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4)
similarity of the parties' retail outlets (trade channels) and customers, (5) similarity of
advertising media, (6) defendant's intent and (7) actual confusion.  *Frehling Enters. v. Int'l Select
Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir.1999). While the Court does not have to resolve all
seven factors in a plaintiffs' favor in order to establish a likelihood of confusion, the Court can
only consider these factors once evidence is presented and rarely are these factual issues resolved
at the summary judgment stage, let alone on a Rule 12(b)(6) Motion to Dismiss.  *Gen.
Conference Corp. of Seventh Day Adventists v. Perez,* 97 F.Supp.2d 1154, 1157 (S.D.Fla.2000).
The type of mark and evidence of actual confusion are the most important factors when assessing
whether or not a likelihood of consumer confusion exists.  *Frehling Enters.,*192 F.3d at 1335.
Clearly, an analysis of the *Frehling* factors is not appropriate at this stage of the litigation.
Plaintiffs have adequately pled that there is a clear likelihood of confusion caused by
Defendants' use of "The Fitchuation" and the use of "The Situation" (3 times) in the Press
Release.  When appropriate, Plaintiffs will present evidence that Defendants used Plaintiff's
Mark intentionally, in order to create a highly successful marketing and advertising campaign.
None of the cases cited by Defendants in the Motion are on-point here.  In *Toho Co. v. Sears*

*Roebuck,* 645 F2d 788, 790 (9th Cir 1981), the plaintiff produced and distributed movies and TV cartoon series featuring the character "Godzilla" and used a picture of Godzilla and the slogan "King of the Monsters" in promotions.  The plaintiff sued for improper use of the "Godzilla" mark in the defendant's sale of garbage bags that displayed the word "Bagzilla", which had a "comic, helpful, personified reptilian creature", and which used the phrase "Monstrously Strong Bags."  The case is distinguished from the instant matter because the parties were selling completely different and unrelated goods in completely different markets (garbage bags vs. literary works and toys) and the defendant sufficiently changed the mark so as not to draw from the plaintiff's goodwill.  In the instant matter, both Plaintiffs and Defendants are producing apparel; Defendants are using Plaintiffs' exact Mark to draw from Plaintiff's goodwill and in the exact same market.

Defendants' reliance upon the holding in *Hensley Mfg. v. Pro Pride Inc.,* 579 F3d. 603, 611 (6th Cir 2009) is equally unavailing. There, plaintiff and defendant both manufactured and sold trailer hitches "designed by Jim Hensley". Plaintiff claimed the defendant's use of Jim Hensley's name in advertising material was likely to confuse consumers and infringed on the "Hensley" registered trademark.  The court held that "[t]he use of an individual's name in an accurately descriptive sense, as opposed to the use (of the name) as a trade name is acceptable under" the fair use exception to claims of trademark infringement.  The holding is distinguished from the instant case because the name "The Situation" was not used in a "descriptive sense."  It was used as a trade name.  Jim Hensley is a person's name.  "The Situation" is not…it is a trademark.

Defendants' reliance upon the holding in *Sweet v. City of Chi.*, 953 F.Supp 225, 231 (N.D. Ill. 1996) is likewise unavailing. There, a plaintiff authored a book titled, "Eat Your Art Out, Chicago" that listed restaurants/bars in Chicago that exhibited art for sale.  The defendant conducted an annual food festival and presented the "Eat Your Art Out" art fair, featuring works by local artists.  The court dismissed the complaint, in part, because Plaintiff merely made the "conclusory assertion" that confusion is likely and set forth no facts to support such confusion, and because there was no attempt by the defendant to trade upon the goodwill of the plaintiff.  In *Sweet*, there were also sharp differences in the nature of the goods and services being sold by the parties.

Defendants' citation to the holding in *Bitancur v. Florida,* 2008 WL 506305L (N.D. Fla. 2008) is a drastic stretch from the facts in the instant case.  In *Bitancur,* the plaintiff had a

"certification mark" in the name of "Naturopathic National Council, Inc" and a license as a Doctor of Naturopathy, N.D.  The plaintiff claimed a personal right to the trademark of "Doctor of Naturopathy, N.D."  There were no claims that the defendant used the trademarks to cause confusion and the plaintiff did not even allege ownership of the trademark.

 Finally, Defendants citation to *Marvel Enters., Inc. v. NCSoft Corp.*, 74 U.S.P.Q. 2d 1303 (C.D. Cal. 2005) is easily distinguished.  There, the defendants used word the "Statesman" and the plaintiff's trademark was for "Captain America."  Here, Defendants used Plaintiffs' exact Mark "The Situation" in their Press Release and a confusingly similar phrase "The Fitchuation" on their apparel.


### C.   Irrespective of the likelihood of confusion with "The Fitchuation," Plaintiffs deserve common law trademark rights in "The Situation" which cannot be resolved at this stage of the case.

Defendants' arguments that Plaintiffs' registration is only of a stylized version the Mark are irrelevant to rebut Plaintiffs' common law claims. Even if this Court found that that Plaintiffs' federal registration of the stylized version of the mark "The Situation" is *fundamentally different* in both wording and stylization from Defendants' use of the Mark, Plaintiffs have adequately pled the basis of common law protectable trademark rights in the Mark "The Situation." When appropriate (at trial), Plaintiffs will present substantial evidence that the public has come to recognize the Mark "The Situation" as a symbol that identifies and distinguishes Sorrentino's goods and services.  Defendants' argument regarding the distinction and the timing of their uses of the Mark are not appropriate on a Rule 12(b)(6) Motion to Dismiss; Defendants are asking this Court to consider new evidence about <u>when</u> they began to sell their "Fitchuation t-shirt" in comparison to when Plaintiffs sold their "Situation T-shirts".  This <u>factual</u> issue is irrelevant to the claims as pled and is inconsistent with the effective date of the Plaintiffs' registered Mark, which clearly predates the Defendants' new evidence about when it began to sell their t-shirts. Most relevantly, Defendants do not deny that it began to sell their Fitchuation t-shirt after Plaintiffs' Mark became famous and Defendants do not deny that their t-shirt was intended to draw upon the goodwill of the Plaintiff's Mark.


### D.  Defendants use of "The Situation" Mark cannot be determined to be fair use/ parody at this stage of the case.

The affirmative defense of fair use/parody is a mixed question of law and fact as to which the proponent carries the burden of proof. *See Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 590, 114 S.Ct. 1164, 1177, 127 L.Ed.2d 500 (1994); *Harper & Row, Publishers, Inc. v. Nation Enters,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985).  The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived.   *Campbell,* 510 U.S. 569 *Id.* at 582.   It is premature for Defendants to provide evidence that the parodic character of "the Fitchuation" may reasonably be perceived and Defendants have offered no evidence of same.   However, even if Defendants could offer some evidence of parody, it could not overcome the presumption against a finding of parody since Defendants do not deny their use was intended to generate a profit.

The first factor in a fair use enquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit or educational purposes."  § 107(1).  *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).  Because Abercrombie made the "Fitchuation" t-shirts for a commercial/profit-making purpose, such use would presumptively be unfair.  *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984).  The cases cited by Defendants do not support the Court making a legal determination that "The Fitchuation" is a parody of "The Situation" as a matter of law.  Plaintiffs have adequately pled that Defendants purposefully released the "Fitchuation" shirts to capitalize on Plaintiff's immense popularity, as part of a line of "Jersey Shore" T-shirts.  In the face of such pleadings the Defendants ask this Court to accept facts (outside of the complaint) about: 1) Defendants' protection of the "Fitch" mark, 2) that Sorrentino "assigned his abdominal muscles a humorous nickname", and 3) that Defendants were poking fun at Sorrentino's "self important nickname" by selling a shirt that said "Fitchuation".   Clearly, all of these factual assertions made by Defendants are outside of the four corners of the Second Amended Complaint.

### E.  Defendants' use cannot be determined to be non-actionable, non-trademark ornamental use.

Whether or not Defendants use of the "Fitchuation" mark was an ornamental use or whether it was internationally designed to create an association with Plaintiffs is a matter of fact, to be decided by the Jury.

10

**F.     Defendants are not entitled to 1st Amendment Protections because their use of the "Situation" mark in the Press Release is commercial use.**

As demonstrated in the Press Release (DE 68 Ex. B), Defendants used Plaintiff's Mark "The Situation" three times.   The Court must accept as true that Defendants intentionally used Plaintiff's valuable protected Mark to create an association with Sorrentino and to draw public attention to its' brand, its' store, its' product and its' e-commerce web sites.   The cases cited by Defendants:  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir.2005) and *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, —— F.3d ——, No. 09–cv–16412, 2012 WL 2076691 (11th Cir. June 11, 2012), each (like many other cases) acknowledge that no 1st Amendment protections are granted to commercial speech.   At trial, Plaintiffs will present substantial evidence (including admissions on the part of Defendants) that Defendants purposely used Plaintiff's enforceable Mark "The Situation" as part of a valuable advertising campaign, that was designed to and did in fact generate publicity, public awareness and advertising for Defendants' stores, its' brand, its' products and its' e-commerce web sites.

**III.    Plaintiffs have adequately stated a claim for False Advertising under the Lanham Act and under Florida Law.**

Defendants claim that the statements in the Press Release cannot form a basis of a false advertising claim under the Lanham Act and under Florida Law because the statements in the Press Release are statements of opinion.   At DE 68 ¶ 14,15,16,18,19,20,21,26,54,59, Plaintiffs plead the six false statements contained in the Press Release.   Further, Plaintiffs have pled at DE 68 ¶23,24,29,31,33,49,55,56,60  that Defendants acted intentionally and fully knowing that their actions would create an association with Sorrentino as part of an advertising strategy designed to (and which did) create advertising, publicity and notoriety of Defendants stores, its' brand, its products and its e-commerce web sites which was worth many millions of dollars to Defendants.

In their Motion, Defendants ask this Court to ignore all of Plaintiffs' allegations, while admitting that some of the statements in the Press Release require the presentation of evidence. Defendants cite to no precedent that allows, on 1st Amendment grounds, a for-profit company to make commercial use of a Plaintiff's name and/or trademark.   However, numerous cases oppose Defendants' defenses.   "The First Amendment provides no right to use an individual's identity without his or her consent as a vehicle for the promotion of a commercial product," as

Abercrombie has done here. *See Cummings v. Sony Music,* 2003 U.S. Dist. Lexis 15007, 16 (S.D.N.Y 2003); *Gritzke v. M.R.A. Holding,* 2002 U.S. Dist. Lexis 28085, 4 (N.D. Fla. 2002).

Defendants ask this Court to accept the following new facts (which Plaintiffs will oppose at the appropriate moment):

1.      That Defendants "offered Sorrentino money not to wear their Brand" (DE 68 ¶20).  Plaintiffs will present evidence that: 1) no legal offer was made, and 2) no offer was ever made <u>to Sorrentino</u>.

2.      That Defendants issued the Press Release, not as a marketing ploy or advertising scheme as Plaintiffs have claimed, but rather as an effort to protect its' brand. The court should not accept Defendants' misleading and inaccurate allegations as being true, especially in light of the clear allegations to the contrary at DE 68 ¶14,15,17,23,24,25,26,31,33,58,60,82.

**IV.     Plaintiffs have adequately pled each of the elements of an unfair competition and dilution claim.**

Defendants make the unsupported statement that Plaintiffs do not and cannot allege sufficient facts to establish the time of Plaintiffs' use of "The Situation" Mark.   Clearly Plaintiffs' have done so. (DE 68 ¶3,4,5,8,10,11,13,16, and 60).  Next, Defendants make the false statement that Defendants used the Mark prior to Plaintiff's Mark becoming famous.  Again, Defendants are simply wrong.   (DE 68 ¶8,10,13). Indeed, the entire premise of the Second Amended Complaint is that Defendants used "The Situation" in the Press Release and on the T-shirt in order to capitalize and to commercially take advantage of Plaintiff's well known Mark. (DE 68 ¶13,14,15,17,23,29,31,33).  Since Plaintiffs have pled Defendants' commercialization of a famous mark, none of the cases cited by Defendants are applicable.   Defendants are not currently entitled to a determination that their use of "The Fitchuation" is or is not a parody for Lanham Act purposes. Thus, the Court cannot, at this point, determine that the state claims are barred under the Defendants' parody theory.

**V.      Plaintiffs have adequately stated a claim for injury to their business reputation.**

Again, Defendants ask this court to ignore the clear factual pleadings of the Second Amended Complaint.  Defendants are simply wrong that Plaintiffs have not pled a likelihood of

harm to Plaintiffs' reputation and/or dilution of Plaintiff's mark.   (DE 68___
20,21,24,36,37,42,51,  77).

## VI.   Plaintiffs Have Adequately Stated A Claim for violations of  Fla. Stat. 540.08.

Defendants commence their efforts to debunk Plaintiffs' §540.08 claim by reiterating a
1st Amendment protection allegedly due to their tortious use of "The Fitchuation" on
Abercrombie t-shirts. (DE-72, pg. 17). Plaintiffs, however, are not suing Defendants under
§540.08 Fla. Stat. for their use of "The Fitchuation" on the T-shirts.  Rather, <u>Plaintiffs are suing
Defendants under §540.08 only for their commercial use of Sorrentino's name in the Press
Release/advertisement.</u> Thus, all of Defendants' arguments about parody and the strength of
Plaintiff's Mark are completely irrelevant to the Plaintiffs' claims under F.S. §540.08.

Defendants next claim that 1st Amendment protections are recognized in *Tyne v. Time
Warner Ent. Co.,* 901 S.2d 802 (2005) and *Loft v. Fuller*, 408 So.2d 619, 622 (Fla.Dist.Ct.App.
4th Dist.1981).  However, these cases, which only discuss 1st Amendment protections for an
artistic expression such as in a book, movie or TV show, are not applicable here where
Defendants' use is not a creative, artistic and expressive use, but rather, clearly a commercial and
advertising use.

Courts in Florida have uniformly held that a party's commercial use of an individual's
name is not protected speech and thus, Defendants' defenses to Plaintiffs' §540.08, claim must
fail.  *Valentine v. CBS, Inc*., 698 F.2d 430 (11th Cir.1983); *Gritzke v. MRA Holdings* 2002 U.S.
Dist. LEXIS 28085 (N.D. Fla. 2002); *Weinstein Design Group v. Fielder*, 884 So.2d 990 (Fla.
4th DCA 2004), citing *Loft v. Fuller*, 408 So. 2d 619, 622 (Fla. 4th D.C.A. 1981); *Nottage v.
American Express* Co., 452 So. 2d 1066 (Fla. 3d DCA 1984) (reversing an order of Dismissal of
§540.08 claim); *Chen v. Cayman Arts*, 755 F. Supp. 2d 1294 (S.D. Fla. 2011) (refusing to
dismiss Lanham Act, Section §540.08 and common law appropriation claims); *Jackson v Grupo
Industrial Hotelero*, 2009 Us Dist. Lexis 116770 (S.D. Fla. 2009) and *Sun International
Bahamas, Ltd. v. Wagner,* 758 So.2d 1190 (Fla. 3d DCA 2000).

**A.  Defendants' use of Sorrentino's name in the Press Release, was designed to (and did in fact) directly promote Defendant's products, for a "commercial" or "advertisement" purpose under § 540.08 which is not protected by the First Amendment.**

Defendants exploited Sorrentino's name as part of an advertising campaign, purposefully designed, orchestrated and intended to create and enhance brand awareness for its' stores and products, which was enormously successful in generating a thousand newspaper articles, Internet stories and blogs, and which proved to be an immensely successful marketing strategy for Defendants. Because the Press Release—the foundation of Defendants' ad campaign—had as its sole purpose the creation of worldwide publicity for the Abercrombie brand, Defendants' publication of Sorrentino's name as the cornerstone of the campaign was for commercial and advertising purposes under §540.08. Many of the stories that followed the Press Release identified Defendants' Press Release as an "advertisement", an "advertising ploy", a "publicity stunt" and/or a "marketing scheme" (which was) specifically and intentionally designed to arouse publicity of and draw attention to Abercrombie's products and stores, using Sorrentino's huge market appeal to the exact target market of Abercrombie's stores at the precise moment of Abercrombie's critical back-to-school marketing campaign.  Plaintiffs include such allegations in their pleadings at (DE 68 ¶14, 15, 16, 17,31,61,64, and 82). *See also* the final paragraph of (DE 68 Ex. B), which directly promotes Defendants' stores, its' brand and its' e-commerce web sites. Defendants' citation to *Faulkner Press, L.L. C. v. Class Notes, L.L.C.*, 756 F.Supp.2d 1352 (N.D.Fla.2010) is not applicable since *Faulkner* involved the non-commercial use of (a plaintiff's name) in a creative, expressive literary work.

The Supreme Court in *Tyne v. Time Warner Ent. Co.,* 901 S.2d 802 (2005)*,* approved the construction given to §540.08 in *Loft v. Fuller,* 408 So. 2d 619 (Fla. 4th DCA 1981), in which the court stated: "…the publication is harmful….because of the way it associates the individual's name or his personality with something else"*. Loft*, 408 So. 2d at 622-23. Here, Defendants attempted to associate Sorrentino's identity with the Abercrombie brand for the express purpose of promoting Abercrombie products—the very type of commercial exploitation of an individual's identity that § 540.08 penalizes. In *Valentine v. C.B.S., Inc.*, as well as in *Tyne* and *Loft* (which Defendants cite to defend their argument), the courts held against the plaintiff because the defendants' use of the plaintiff's name was not geared toward promoting any

14

product, but was instead part of an expressive, creative work as described in F.S. 540.08(4)(b) (e.g., a song, book or movie).  Hence, each of these cases is easily distinguishable from the instant case because there is no book, movie, play or other expressive work, but rather a commercial use.

*Lane v. MRA Holdings,* 242 F. Supp. 2d 1205 (M.D. Fla. 2002), is also squarely in line with the holdings in *Loft* and *Tyne*, and thus strongly supports the denial of Defendants' Motion to Dismiss. In *Lane*, the Middle District of Florida considered whether the defendant violated §540.08 by displaying the plaintiff exposing her breasts in a "Girls Gone Wild" video. The court, in rejecting the plaintiff's §540.08 argument, explained that "the use of another's identity in a novel, play or motion picture is…not ordinarily an infringement...[unless] the name or likeness is used solely to attract attention to a work that is not related to the identified person." *Lane*, 242 F. Supp. 2d at 1213. Since the plaintiff in Lane had not been associated with any other product or service *unrelated to her participation in the video,* she could not recover under §540.08.[3] The Court should compare these holdings to that of *Gritzke v M.R.A. Holding, LLC.*, 2002 US Dist. Lexis 28085 (N.D. Fla. 2002) in which the court refused to dismiss a similar case, because the Plaintiff's image was on the outside packaging of the video at issue. *Gritzke v M.R.A. Holdings, LLC*, 2002 US Dist. Lexis 28085 (N.D. Fla. 2002). Unlike the facts in *Tyne*, *Loft* and *Lane*, where the identity of the plaintiff was used in the film and not exploited to advertise any other products or services, but was themselves the object of the creative expressive production, Defendants employed and exploited Sorrentino's name to draw attention to the Abercrombie brand, and thus to directly promote their products, stores, and e-commerce web sites. Sorrentino is in no way associated with Defendants' brand. Therefore, Defendants should have paid Sorrentino for their marketing campaign, which was designed to enhance brand awareness for Defendants' products and stores by exploiting Sorrentino's celebrity name and likeness. Ultimately, as demonstrated by the myriad stories generated, it was Sorrentino's fame that created such a "buzz" about the alleged offer. Sorrentino deserved adequate recompense for that exploitation of his identity, and Defendants' refusal to remunerate him renders their use of his name and likeness a violation of §540.08. *See Daly v. Hippo Golf Company, Inc.*, 646 F. Supp. 2d 1347 (S.D. Fla. 2009).  Defendants ask this court to accept their newly created factual

---

[3] The court's holding in *Lane* also considered First Amendment arguments, which the court found to weigh against liability in light of the video's expressive value.

position that the Press Release was expressly disclaiming any association. *See* (DE 72 at FN 18). This factual allegation directly conflicts with the Plaintiffs' allegations at (DE 68 ¶14, 23, 28,28,31,29,31, and 33).  Clearly the court cannot, at the 12(b)(6) stage of litigation,  determine that Defendants' allegations are  better pleaded than Plaintiffs' allegations.

**B. Defendants' Press Release could not constitute a "bona fide" news report having a legitimate public interest because the story was created by Defendants and then published solely for advertisement purposes and because Defendants are not a news medium, as defined by F.S. 540.08 (3)(a).**

Defendants ask this court to consider the dissemination of the Press Release to be news which falls under the exception set forth in 540.08(4)(a).  Defendants ignore that the statute specifically limits the news exception to action by a "news medium" and to the dissemination of a "bona fide news report".   A fundamental principle of statutory construction is that courts should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which [sic] implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). Essentially, statutes should be construed "so as to avoid rendering superfluous" any statutory language. *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). Merriam-Webster Dictionary defines "bona fide" as (1) made in good faith without fraud or deceit, (2) made with earnest intent, or (3) neither specious nor counterfeit. Black's Law Dictionary echoes Merriam-Webster's definition, defining "bona fide" as (1) made in good faith; without fraud or deceit (2) Sincere; genuine.   *Black's Law Dictionary, 9th Edition,* 2009. Accordingly, the insertion of "bona fide" to qualify "news report" in the "newsworthiness" exception of §540.08 should be read as a deliberate effort to distinguish good faith news reports devoid of fraud or deceit from <u>advertisements in disguise</u> (such as Defendants' Press Release), such as the publication described in *Weinstein* and to expose the latter to liability.

Defendants fail to explain how the exception in §540.08 (4)(a) would apply to the Press Release, because Defendants are not a "news medium and the Press Release is not a  publication such as a newspaper or magazine". Finally, Abercrombie asks this Court to determine (as a matter of law) that the Press Release/advertising campaign was a bona fide news report and not made for advertising purposes. Clearly, the Court cannot make that determination until it hears evidence about the nature and intent of Abercrombie's Marketing Department.  In *Weinstein,* the

16

court affirmed a final jury verdict, finding a magazine story about the defendant's interior design services, which mentioned the work done by the defendant on the plaintiff's condominium, was not a bona fide news story, but rather (unprotected) commercial advertising because the defendant paid for and then distributed that story to generate publicity and/or goodwill about its' design services. *Weinstein*, 884 So.2d at 997. In *Weinstein*, the defendant presented evidence in the form of testimony of the magazine's editor (that the article was newsworthy) and in response, the plaintiff presented "testimony that could have allowed the jury to conclude that the magazine article was used for advertising purposes". *Id.* at 998. The appellate court concluded that the jury properly decided the factual issues and *Weinstein*'s Motion for Summary Judgment and Directed Verdict were properly denied.

Plaintiffs have pled that: (1) Defendants' Press Release was purposefully and intentionally created solely to enhance brand awareness for Abercrombie, its products, its stores, and its e-commerce web sites, by intentionally creating a false association between Defendants and Sorrentino; or, in the alternative, that (2) Abercrombie purposefully selected Sorrentino to be the object of its' advertising campaign due to his immense market appeal and popularity among the same target market as Abercrombie's customers. Abercrombie cannot (and it does not) assert that it is a news medium. Defendants themselves created and publicized the supposed "news," and were themselves, (like the defendant in Weinstein) responsible for disseminating it. Defendants' letter to MTV regarding the alleged offer to Sorrentino was an integral part of their advertisement ploy, which Defendants figured they would use—perhaps in anticipation of litigation—to somehow substantiate the genuineness of their offer. The letter to MTV did not represent a good faith offer by Defendants to Sorrentino, rather, Defendants intentionally concocted the facts that formed the basis of their Press Release and letter to MTV—namely, their alleged offer to Sorrentino—in order to be able to generate subsequent commentary and publicity. Even if Defendants' statements fell under the most expansive definition of the phrase "news report," Defendants' statements could never be conscientiously regarded as "bona fide" news, and certainly not until evidence is presented on the subject. The insertion of this statutory phrase "bona fide" serves precisely this distinguishing function: to weed out advertisements in disguise (such as that described in *Weinstein)* and subject their authors to liability.

The true purpose of Defendants' advertising campaign is further demonstrated by the incongruity of the Press Release with Defendants' various contemporaneous attempts to

associate themselves with Sorrentino by openly advertising t-shirts using Sorrentino's trademark. The fact that Defendants claimed that Sorrentino was damaging their image while, concomitantly, attempted to create the impression that Sorrentino endorsed their products, exposes the true object of the Press Release and Facebook Post, which was nothing more than a publicity stunt designed to augment brand awareness for Abercrombie and to publicly disseminate information about Abercrombie's stores and its' e-commerce web sites.  Clearly, the Court (at this stage) cannot accept Abercrombie's position that the Press Release is either newsworthy or non-commercial speech.

### C.   Defendants' Press Release could not constitute a bona fide news report having a legitimate public interest because Defendants' alleged offer to Sorrentino was a fabrication.

New York Courts have treated the state's parallel provision extensively, with outcomes similar to that in *Weinstein*. While analyzing cases arising out of New York's misappropriation statute, Civil Rights Law § 50 and § 51, the equivalent of F.S. 540.08, New York courts have uniformly held that where works are "so infected with fiction, dramatization or embellishment they cannot be said to fulfill the purpose of the newsworthiness exception." *Messenger v. Gruner*, 94. N.Y 2d 436, 446 (N.Y. 2000); *see also Solano v. Playgirl, Inc.*, 292 F. 3d 1078, 1089 (9th Cir. 2002) ("Even though the exceptions are to be broadly construed, the newsworthiness privileges do not apply where a defendant uses a plaintiff's name and likeness in a knowingly false manner to increase sales."). Since the newsworthiness exception of misappropriation statutes is intended to protect *informative* works, in which the public has a *legitimate interest*, a work whose content is substantially fabricated or falsified does not fall under the purview of the exception as ultimately determined by the jury. The public, by definition, cannot have a legitimate public interest in information that is false and deceiving, and, therefore, such information cannot be newsworthy. A biography of a well-known person— otherwise a work of public interest— may be found to be published for purposes of trade and to be outside the scope of "newsworthiness" where its content is substantially fictionalized. *See Spahn v. Julian Messner, Inc.*, 21 N.Y. 124 (N.Y. 1967). Similarly, a magazine article that fictionalizes a plaintiff forfeits protection under the newsworthiness exception. *See Goldberg v. Ideal Publishing Corp.*, 210 N.Y.S. 2d 928 (Sup. Ct. N.Y. Cty. 1960) (endorsing *Molony v. Boy Comics Publishing, Inc.*, 277 App. Div. 166, 98 (1st Dept. 1950), where the court stated that the

right of publicity statute is violated if a name or photograph is used in connection with an article of fiction…) *See also Sutton v. Hearst Corp.*, 277 App. Div. 155 (1st Dept. 1950) (complaint adequately stated cause of action because, though woman had been bequeathed one perfect rose a week by a secret admirer, the newspaper story embellished to the point of fictionalization).

Due to the six falsehoods alleged to be contained in the Press Release, Defendants' statements do not merit the protections of the newsworthiness exception.

> ### 2. Even if Defendants' Letter intended to convey an offer to Sorrentino (through MTV), the Press Release exposes Defendants' use of Sorrentino's name for commercial purposes.

Defendants' Press Release is dated on its face August 12, 2011,[4] and their letter to MTV is dated August 15, 2011.  In their Press Release, Defendants stated that Abercrombie *had* already offered Sorrentino compensation, yet, in addition to never directly contacting Sorrentino, the letter to MTV was dated on August 15, 2011.

## VII.   Plaintiffs Have Adequately Stated A Claim For Common Law Misappropriation.

As Defendants admit, common law misappropriation claims "should be resolved on the same basis" as claims under Fla. Stat. § 540.08. (DE 72 pg. 19). As such, Defendants' Motion to Dismiss Plaintiffs' common law misappropriation claims should be denied for the same reasons as those set forth above.

## VIII.   Plaintiffs Have Adequately stated the Elements of a violation of Fla. Stat. § 817.41.

Defendants' six false statements in the Press Release meet the definition of "misleading advertising" for the same reasons as those stated above.  Hence, the cases cited by Defendants are not on point.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs, MPS Entertainment, LLC, and Michael P. Sorrentino, respectfully request that this Court deny Defendants' Motion to Dismiss Plaintiffs' Verified Second Amended Complaint and grant any other relief that this Court deems just and proper under the circumstances, including, if necessary, the opportunity to file an Amended Pleading.

---

[4] In its Motion to Dismiss, Abercrombie claims the Press Release was not issued until after the letter was sent to MTV.  Abercrombie asks this Court to consider (evidence) outside of the allegations of the Complaint.

Dated: July 5, 2012                    Respectfully submitted,

                                       **WOLFE LAW MIAMI, P.A.**
                                       *Attorneys for Plaintiffs*
                                       175 SW 7th Street, Suite 2410
                                       Miami, FL 33130
                                       Phone: 305-384-7370
                                       Fax:    305-384-7371


                                       By: __*s/Richard C. Wolfe* _____
                                           RICHARD C. WOLFE
                                           Florida Bar No.: 355607
                                           rwolfe@wolfelawmiami.com
                                           DARREN A. HEITNER
                                           Florida Bar No.: 85956
                                           dheitner@wolfelawmiami.com

### CERTIFICATE OF SERVICE

      I hereby certify that on July 5, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

                                       *s/Richard C. Wolfe* _____
                                       Richard C. Wolfe

**<u>SERVICE LIST</u>**
**Case No. 11-CV-24110-LENARD/O'SULLIVAN**

Gerald J. Houlihan
Houlihan & Partners, P.A.
2332 Galiano Street, Second Floor
Miami, Florida 33134
Tel. (305) 460-4091
Fax (305) 397-0955
Email: houlihan@houlihanlaw.com

Jessica D. Bradley, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Tel. (202) 879-7695
Fax (202) 626-1700
Email: jbradley@jonesday.com

John G. Froemming, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Tel. (202) 879-4693
Fax (202) 626-1700
Email:  jfroemming@jonesday.com