UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CV-24110-LENARD/O'SULLIVAN

MPS ENTERTAINMENT, LLC, a
New Jersey Limited Liability Company,
and MICHAEL P. SORRENTINO,
an individual,

       Plaintiffs,

vs.

ABERCROMBIE & FITCH STORES,
INC., and ABERCROMBIE & FITCH, CO.

       Defendants.
_____/

**<u>PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION AND
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO STRIKE
IRRELEVANT MATERIAL AND UNSUPPORTED ALLEGATIONS FROM
PLAINTIFFS' SECOND AMENDED COMPLAINT [DE 71]</u>**

1

Plaintiffs, MPS ENTERTAINMENT, LLC ("MPS") and Michael P. Sorrentino ("Sorrentino") (collectively "Plaintiffs"), file this response and Memorandum in opposition to Defendants, Abercrombie & Fitch Stores, Inc.'s and Abercrombie & Fitch Co.'s (collectively "Abercrombie" and/or "Defendants"), Motion to Strike Irrelevant Material and Unsupported Allegations from Plaintiffs' Second Amended Complaint [DE-71] and state as follows:

## INTRODUCTION

### I.   *Factual Background*

Plaintiff, Sorrentino is an internationally known TV star who has appeared on MTV's hit reality show "Jersey Shore," "Dancing with the Stars," "The Tonight Show" and many other internationally televised programs.  Since appearing on the first season of Jersey Shore (which is currently in its sixth season), Sorrentino has used his notoriety and celebrity status to endorse and promote a variety of commercial goods and services.  Sorrentino enjoys lucrative endorsement contracts with several multimillion-dollar companies, such as Devotion Vodka, Reebok, and many smaller companies. On a daily basis he is among the most popular "Google searched" people and he has more than 7,000,000 social media followers on Facebook and Twitter.

Plaintiff, MPS was formed in 2009 for the purpose of developing, marketing and distributing goods and services under trademarks made popular by Sorrentino.  MPS has the exclusive right to license and otherwise use its trademarks, "GTL" and "The Situation" (the "Marks"), in commerce per the specific international classes identified by the United States Patent and Trademark Office (USPTO) and common law protection under the Lanham Act. Plaintiffs have spent substantial time, energy and money to develop the goodwill associated with the Marks and to prohibit third parties from infringing on the Marks.

Following the huge success of Sorrentino's TV show "Jersey Shore", Defendants began to intentionally market and distribute 5 different types of Abercrombie t-shirts containing obvious references to the Marks and Jersey Shore's popularity.  One of these t-shirts reads "The Fitchuation" and another reads "GTL…You Know The Deal" (collectively, "Abercrombie's t-shirts"). Abercrombie's t-shirts bear marks virtually identical to the Marks. These t-shirts were obviously intended to create a false association between Sorrentino and Defendants. Abercrombie's t-shirts were very popular and Defendants sold their entire inventory of the shirts.

On either August 12, 2011 or August 15, 2011, Defendants embarked on a global advertising campaign using Sorrentino's name and his trademark "the Situation" to enhance brand awareness for it's products, it's stores and to direct consumers to its' various e-commerce web sites by <u>falsely</u> claiming that Abercrombie had offered money to Sorrentino to <u>stop</u> wearing it's goods. The cornerstone of this advertising campaign was an advertisement (which Abercrombie calls a "Press Release") issued by Abercrombie ("Abercrombie's Advertisement"). In Abercrombie's Advertisement, Defendants claimed that Sorrentino's use of Defendants' clothing was contrary to the "aspirational nature of the (Abercrombie) brand" and that by wearing Abercrombie clothing, Sorrentino would be "causing significant damage" to the brand's image, that it's fans were distressed that Sorrentino was wearing Abercrombie clothes and that Abercrombie had offered a substantial amount of money to Sorrentino to stop wearing Abercrombie branded clothes and to wear another brand of clothing. Abercrombie published the Abercrombie Advertisement on the "Investor Relations" section of it's website and on it's official Facebook page. None of the statements contained within Abercrombie's Advertisement were truthful. At no time did Sorrentino, or anybody acting on his behalf, give implied or express permission to Defendants to use his name or his Mark in commerce in the Advertisement.

3

Abercrombie's Advertisement contained 6 false statements.  Abercrombie's Advertisement was drafted (in part) by Abercrombie's in-house advertising copywriter and Abercrombie has admitted to using Sorrentino's famous trademark (the "Situation") 3 times in the Advertisement to create consumer awareness of it's products, it's stores and it's E-commerce web sites. The entire premise of Abercrombie's Advertisement was completely false.  Abercrombie has since claimed that it needed to "disassociate" from Sorrentino because the public may have believed that Sorrentino was endorsed by Abercrombie merely based on the fact that he wore "A and F" branded sweatpants on one episode of Jersey Shore (i.e. Season 4 Episode 2), which aired on August 11, 2011. In truth, Sorrentino purchased the sweatpants merely because he liked the material.  He made no statement to create an association with Abercrombie and he was seen on the Season 4, Episode 2 of the Jersey Shore show wearing the ("A and F") sweatpants for a grand total of 9 seconds and never for more than 3 consecutive seconds.  Indeed, Abercrombie has now admitted that other than a few of it's own employees, it is unaware of anybody even noticing that Sorrentino was wearing A and F branded sweatpants and not a single member of the press or the public made a public comment that Sorrentino was wearing Abercrombie branded sweatpants on the show.  Without a doubt, had Abercrombie truly wanted to prevent an association with Sorrentino, the last thing that it would have done was to bring the matter to attention of the public.

As a predictable and intended result of Defendants' false and deceptive advertising campaign, more than 1,000 members of the press wrote stories about Abercrombie's Advertisement.  Defendants' advertising campaign has been immensely successful, as it has resulted in newspapers, television stations and Internet bloggers publishing stories about Defendants' products, stores, their brand and their e-commerce websites. Many of those stories

4

stated that Abercrombie had created a publicity stunt or marketing campaign using Sorrentino's name and/or his trademark as the engine that generated the publicity.

Defendants' advertising and publicity campaign was intentionally designed to create consumer awareness of Defendants' goods, their e-commerce web sites as well as general corporate publicity and notoriety, which was worth millions of dollars to Defendants and which was accomplished through the exploitation of Sorrentino's name and his trademark. Indeed, had Defendants not made Sorrentino the object of the Advertisement, none of the valuable publicity would have followed. Defendants have not filed their Answer to the Second Amended Complaint, so it may be entirely plausible that the exhibits (to the Complaint) also relate to the Affirmative Defenses asserted by Defendants.

## II.   PROCEDURAL BACKGROUND

1. On November 15, 2011, Plaintiffs filed and served their Verified Complaint and Demand for Jury Trial against Defendant, Abercrombie & Fitch Stores, Inc. for (1) Trademark Infringement Under the Lanham Act; (2) Unfair Competition and False Designation of Origin-15 U.S.C. 1125(a); (3) Unfair Competition Under Florida Statutes 495.131,151; (4) Deceptive, False and Misleading Advertising-Florida Statues 495.151; (5) Trademark Infringement under Common Law; and (6) Violation of F.S. 540.08 [DE-1]

2. On December 12, 2011, Defendant, Abercrombie & Fitch Stores, Inc. filed its Motion and Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim Upon Which Relief Can Be Granted. [DE-6]

3. On January 4, 2012, Plaintiffs filed their First Verified Amended Complaint and Demand for Jury Trial against both Defendants for the same causes of action. [DE-19]

4. On January 24, 2012, Defendants filed their Motion to Dismiss [DE-27] and their Motion and Memorandum of Law in Support of their Motion to Strike Irrelevant Material and Unsupported Allegations from Plaintiffs' First Amended Complaint. [DE-28]

5. On May 4, 2012, Plaintiff filed a Motion for Leave to File a Second Amended Complaint [DE-46]. That Motion was granted on June 14, 2012 [DE 66] and the Court ordered that the Motion to Strike was denied as being moot. [DE-69]

6. On June 15, 2012 Plaintiff filed its Second Amended Complaint [DE 68].

7. On June 29, 2012 Defendants filed their current Motion to Strike [DE 71].

8. Defendants' Motion to Strike Irrelevant Material and Unsupported Allegations from Plaintiffs' Second Amended Complaint is merely an attempt to exclude relevant evidence from the jury. As demonstrated, the exhibits attached to Plaintiffs' Second Amended Complaint do support the allegations encompassed in the Second Amended Complaint. Hence, the Motion to Strike should be denied.

## MEMORANDUM OF LAW

Under the Federal Rules, pleadings are to be liberally construed, and technical exactness in drafting is not required. *Irizarry v. Palm Springs Gen. Hosp.*, 657 F. Supp. 739, 740 (S.D. Fla. 1986). Simply stated, the purpose of pleading under the Federal Rules is to give <u>notice</u> rather than to provide those details of the issues and evidence that would eventuate at trial. *Bazal v. Belford Trucking Co., Inc.*, 442 F.Supp. 1089, 1102 (S.D. Fla. 1977).

It is axiomatic that striking a portion of a pleading "is a drastic remedy that is disfavored by the courts," and is usually denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Agan v. Katzman & Korr, P.A.*, 328 F.Supp.2d 1363, 1367 (S.D. Fla. 2004). Indeed, motions to strike are often considered "time

wasters." *Poston v. American President Lines, Ltd.*, 452 F. Supp. 568, 570 (S.D. Fla. 1987) (noting that motions to strike are "time wasters" that "will <u>usually be denied</u> unless the allegations have <u>no possible relation</u> to the controversy and may cause prejudice to one of the parties.") (emphasis added); *See also* 2A Moore's Federal Practice, P 12.21(2) (1979) ("Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation. If there is any doubt as to whether under any contingency the matter may raise an issue, the motion should be denied.").

Courts have "broad discretion in disposing of motions to strike." *Home Mgmt. Solutions, Inc. v. Prescient, Inc.*, No. 07-20608, 2007 WL 2412834, at *2 (S.D. Fla. 2007). "A plea must be wholly irrelevant to authorize the striking thereof." *Batchelder v. Prestman*, 103 So. 473 (Fla. 1931). Further, when deciding a motion to strike, a court must accept the truthfulness of well-pleaded facts and "cannot consider matters beyond the pleadings." *Governor House, L.L.C. v. E.I. Du Pont De Nemours and Co.*, No. 09–21698–Civ, 2010 WL 3212066, at *1 (S.D. Fla. 2010).

      **A.**     **Plaintiffs' References To Defendants' "GTL Shirt" Is Directly Relevant To Show That Defendants Tried To Create An Association With Sorrentino, and That Defendants' Defense (That It Issued The Advertisement To Disassociate Itself From Sorrentino) is Demonstrably False.**

In the First Amended Complaint, Plaintiffs claimed ownership in the mark "GTL" and that Defendant infringed upon that mark by selling a t-shirt using that mark. However, in the Second Amended Complaint Plaintiffs have dropped the Lanham Act claims related to the "GLT shirt". Nevertheless, Plaintiffs' references to Defendants' exploitation of the GTL shirt are directly relevant to rebut Defendants' defenses to Plaintiffs' claims under F.S. 540.08 and under the common law. Defendants claim that they issued the Advertisement to disassociate themselves from Sorrentino. However, Defendants' use of the "GTL" mark demonstrates the opposite.

7

At this stage, the Court must accept Plaintiffs' allegation that Defendants used the "GTL shirt" to create an association <u>with Sorrentino</u> as true and correct. Plaintiffs have pled that Abercrombie's Advertisement was part of a contrived, orchestrated advertising campaign; the cornerstone of which was Abercrombie's exploitation of Sorrentino's name and his famous trademarks "the Situation" and "GTL".

Defendants are expected to plead these facts to be untrue. Based on positions taken in discovery, Plaintiffs anticipate that Defendants will eventually plead that Defendants were merely attempting to advise the public that Sorrentino was not associated with or endorsed by Abercrombie (merely by wearing "A and F" branded sweatpants which could be seen for a total of 9 seconds in one Jersey Shore episode and which nobody other than Abercrombie's own employees took notice of).

As part of the rebuttal evidence, Plaintiffs will present evidence that Defendants created a line of 5 t-shirts meant to exploit Plaintiff's public connection to the "GTL" trademark and to Sorrentino.

Defendants have also claimed that Sorrentino is a disputable public figure and that his simple act of wearing "A&F" brand sweat pants has or could cause damage to the Abercrombie brand. Plaintiffs will rebut these arguments with testimony that Abercrombie acted inconsistently with this newly minted position, by creating a public association with Sorrentino by, inter alia, exploiting Plaintiff's association with the GTL mark, on Abercrombie's "GTL shirt".

Thus, while Plaintiffs admit they do not have a direct claim for violations of the Lanham Act through the exploitation of the GTL shirt, Defendants' use of the GTL mark is directly relevant to Plaintiff's claims under FS 540.08 and related state common law claims.

### B. Plaintiffs' Trademark Applications (Attached to the Second Amended Complaint as Exhibit A) are Directly Relevant to the Allegations.

Plaintiffs have attached as exhibits in their Second Amended Complaint, the following trademark applications:

1. App. Nos. 85/156,576, 85/407,823, and 85/156,584 covering various entertainment services (DE 19-1, pp. 2-5, 32-33),
2. App. Nos. 85/168,011 and 85/406,645 covering dietary and nutritional supplements (*Id.*, pp. 16-17, 36-37)
3. App. No. 85/156,579 covering computer applications (Id., pp. 18-19)
4. App. No. 85/168,019 covering jewelry (Id., pp. 14-15)
5. App. Nos. 85/407,814, 85/405,939, and 85/168,006 covering various personal care products (Id., pp. 8-11, 28-29),
6. App. No. 85/168,032 covering printed material relating to field of diet, exercise, fitness, health, etc., (Id., pp. 12-13)
7. App. No. 85/167,978 covering various types of bags (Id., pp. 30-31), and
8. App. No. 85/167,990 covering health and fitness spa services. (Id., pp. 34-35.)

These trademark applications demonstrate: (1) that Plaintiffs' use of these trademarks have acquired secondary meaning in the marks within the marketplace; (2) the strength of the Marks within the marketplace; (3) such Marks have established goodwill in the marketplace; (4) that Plaintiffs' Marks have international fame; (5) that Defendants intentionally used Plaintiffs' marks to gain publicity for their products; and (6) that Plaintiffs' products and Plaintiffs' popularity is within the Defendants' target market of consumers. In pleadings and in discovery, Defendants have challenged these facts. Plaintiffs do not claim that Defendants used the Marks "GTL" and "The Situation" in connection with goods other than the t-shirts; however, the trademark applications referenced above are vital to Plaintiffs demonstrating that the "GTL" and "The Situation" Marks have acquired goodwill and strength in the relevant marketplace, which is likewise relevant to Plaintiffs' common law and statutory claims under F.S. 540.08.

An important element in the determination of the strength of the mark is its force and recognition in the marketplace. That is, a plaintiff must demonstrate to the court, a mark's degree

9

of recognition in the minds of the relevant consumer class. *Green Bullion Fin. Servs. V. Money4Gold Holdings, Inc.,* 639 F. Supp. 2d 1356 (S.D. Fla. 2009); see also, *Freedom Card, Inc. v. JPMorgan Chase & Co.,* 432 F.3d 463, 472 (3d Cir. 2005) ("In examining a mark's commercial strength, we examine marketplace recognition.") (citation omitted).  Attaching relevant trademark applications serves as relevant evidence with regards to recognition by a class of customers, demonstrating the dates and nature of use in the marketplace by Plaintiffs.

Also important in gauging the strength of a mark is the degree to which third parties make use of the mark. *See John H. Harland Co.,* 711 F.2d at 974-75; *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir. 1981). The less that third parties use the mark, the stronger it is and the more protection it deserves. *John H. Harland Co.,* 711 F.2d at 975.  The aforementioned exhibits will assist the trier of fact in this analysis.

Plaintiffs' trademark applications for: (1) entertainment services; (2) dietary and nutritional supplements; (3) computer applications; (4) personal care products; (5) printed material relating to field of diet, exercise, fitness, health; (5) various types of bags; and (6) health and fitness spa services, were proffered to this Court to demonstrate the strength of Plaintiffs' Marks and Defendants cannot demonstrate that the applications have no possible relation to the issues of the instant case.  Furthermore, the trademark applications demonstrate the bona fide nature of the assignment of a trademark from Yak Shoes Inc. to MPS and the accompanying goodwill that was passed, which is vital to the analysis regarding whether Plaintiffs have a valid federal trademark registration in "The Situation." (See section C below).  Upon information and belief, there are no other commercial entities using a trademark similar to U.S. Registration No. 3,635,203 for "The Situation," especially on those products included and referenced in Plaintiffs'

Second Amended Complaint. Therefore, the exhibits help demonstrate that Plaintiffs' Mark should be considered to be a strong mark within the marketplace.

### C. Plaintiffs Have A Valid Trademark Registration In The "Situation" For A Stylized Use, Which Should Not Be Stricken As Defendants Assert.

Defendants seek to strike Plaintiff's registration number 3,635,203 for use of the "Situation" mark for retail store services and clothing. Defendants assert (without any supporting evidence) that the registration is an invalid assignment in gross. Defendants' arguments are contradicted by the fact that the USPTO accepted Plaintiff's registration, which was published without opposition, and therefore the Yak Shoes registration is relevant evidence to rebut Defendants' assertion that Plaintiffs do not own valued enforceable rights in the "Situation" mark and it is relevant as to WHEN Plaintiff's rights accrued. Although transfer of physical or tangible assets is not required, an assignment without the transfer of physical assets will only be upheld where the assignee "is producing a product or providing a service which is substantially similar to that of the assignor and where consumers will not be deceived or harmed." *Pilates, Inc. v. Current Concepts, Inc.,* 120 F. Supp. 2d 286, 311 (S.D.N.Y. 2000). Courts will look to the "reality of the transaction" to determine if goodwill has passed. *Archer Daniels Midland Co. v. Narula,* 2001 U.S. Dist. LEXIS 9715, 001 WL 804025 *6 (N.D. Ill. July 12, 2001).

There was undoubtedly a valid assignment of U.S. Registration No. 3,635,203 for the "Situation" from the assignor Yak Shoes Inc. to MPS, which has been accepted by the USPTO. Since such assignment, MPS has produced a product and/or provided a service which was substantially similar to that of the assignor.

In their Motion, Defendants misread the assignment from Yak Shoes to MPS. First, the registration clearly rebuts Defendants' argument that the registration is not for retail store

services and clothing.  Second, Defendants' argument is directly rebutted by a clear reading of the document, which states on page 3 (3rd "whereas clause") that all goodwill of assigner is (expressly) assigned to Plaintiff, MPS.  In this regard, Defendants ignore the clear allegations of ¶ 3, 8, 11, of the Second Amended Complaint [DE-68].  Since the Court must accept these allegations as being true, the Defendants have not met their very high burden to exclude the document.

Defendants have falsely claimed that Plaintiffs were denied the trademark registration and that therefore Plaintiffs do not have common law protections in the mark "the Situation". The Yak Shoes assignment (which Defendants seek to exclude) provides direct evidence to contradict the Defendants' assertion, because the USPTO's objection to Plaintiff's registration application was withdrawn once the assignment (from Yak Shoes) was filed.  Also, the assignment is relevant to demonstrate the date upon which Plaintiffs' use of the Mark commenced.  Initially, the USPTO denied Plaintiff's registration, but that was on the grounds of the similarity of the Mark to the registration previously filed by Yak Shoes. However, Plaintiff then was assigned the Yak Shoes registration of the Mark, which had previously been issued.  By seeking to exclude this evidence, Defendants are attempting to limit Plaintiffs' ability to submit evidence that is directly relevant in rebuttal of Defendants' unsupported allegations.

The threshold question in any trademark infringement case is whether the mark is registrable and therefore valid. A trademark's registration on the Principal Register pursuant to 15 U.S.C. Section 1051 is prima facie evidence of the mark's validity. 15 U.S.C. Section 1057(b); *see also Jordan Int'l, Inc. v. United Indus. Sales Org., Inc.*, 699 F. Supp. 268, 270 (S.D. Fla. 1988). MPS is the owner of U.S. Registration No. 3,635,203 for "The Situation," according

to the United States Patent and Trademark Office (USPTO). Based upon the registration, Plaintiffs do have standing to assert a claim against Defendants for trademark infringement.

> **D.     Only The Jury Can Determine If Defendants' Use Of "The Fitchuation," Infringes Upon The Plaintiffs' Common Law Trademark Rights In "The Situation".**

Defendants ask this Court to determine as a matter of law that Plaintiffs' federal registration of "The Situation" is *fundamentally different* in both wording and stylization from Defendants' use of the Mark in their "the Fitchuation" shirt. At this point, the Court must accept the allegations that Defendants and Plaintiffs sell competitive t-shirts without evidence and in opposite to the allegations of the complaint.

> **E.     Since There is Contradicting Evidence Regarding the date of Abercrombie's Advertisement, The Court Cannot Strike Plaintiffs' Allegations.**

Abercrombie's Advertisement is dated on its' face August 12, 2011. Abercrombie's letter to MTV is dated August 15, 2011. Defendants point out that the by-line of the Press Release also bears the date August 16, 2011. That date conflicts with another area on Defendants' website, which states that the Advertisement was published on August, 12, 2011. The court must accept Plaintiffs' pleading and it cannot ignore this factual inconsistency. It is Defendants (not the Plaintiffs) who have created this ambiguity (which has little impact upon the Plaintiffs' claims). In Abercrombie's Advertisement, Defendants stated that Abercrombie *had* already offered Sorrentino compensation, yet, in addition to never directly contacting Sorrentino, the letter to MTV was dated on August 15, 2011. As such, at the time that Defendants distributed Abercrombie's Advertisement, *no offer had been even been made to MTV*, (let alone to Sorrentino) rendering the content of the Abercrombie's Advertisement to a total fabrication. This chronology—first the Release, then the "cover-up" letter—may be cleared up in the discovery process.

**CONCLUSION**

This Court should deny Defendants' Motion to Strike Irrelevant Material and Unsupported Allegations from Plaintiffs' Second Amended Complaint. Defendants' request that Plaintiffs' prayer for a "reasonable royalty" in the amount of (not less than) $1,000,000 should be stricken should also be denied because this is not the appropriate time to have a debate concerning the adequate amount of damages to be assessed. Plaintiffs will provide proof of the reasonable royalty given Defendants' use of the Mark and Sorrentino's market value for the use of his name in commercial advertisements.

Dated this 16th day of July 2012.  Respectfully submitted,

**WOLFE LAW MIAMI, P.A.**
*Attorneys for Plaintiffs*
175 SW 7th Street
Penthouse Suite 2410
Miami, FL 33130
Phone: 305-384-7370
Fax: 305-384-7371

By: *s/Richard C. Wolfe* _____
RICHARD C. WOLFE
Florida Bar No.: 355607
rwolfe@wolfelawmiami.com
DARREN A. HEITNER
Florida Bar No.: 85956
dheitner@wolfelawmiami.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

*s/Richard C. Wolfe*
Richard C. Wolfe

## SERVICE LIST
### Case No. 11-CV-24110-LENARD/O'SULLIVAN

Gerald J. Houlihan
Houlihan & Partners, P.A.
2332 Galiano Street, Second Floor
Miami, Florida 33134
Tel. (305) 460-4091
Fax (305) 397-0955
Email: houlihan@houlihanlaw.com

Jessica D. Bradley, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel. (202) 879-7695
Fax (202) 626-1700
Email: jbradley@jonesday.com

John G. Froemming, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel. (202) 879-4693
Fax (202) 626-1700
Email: jfroemming@jonesday.com