UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:11-cv-24110 - LENARD/O'Sullivan

MPS Entertainment, LLC and
Michael P. Sorrentino,

                           Plaintiffs,

v.

Abercrombie & Fitch Stores, Inc., and
Abercrombie & Fitch Co.,

                           Defendants.
_____/

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO STRIKE
IRRELEVANT MATERIAL AND UNSUPPORTED ALLEGATIONS
FROM PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

| | | |
|---|---|---|
| I. | Plaintiffs Provide No Basis For Adding Their Voluntarily Dismissed "GTL" Claims Back Into The Case............................................................................................. | 1 |
| II. | Plaintiffs' Irrelevant Pending Intent-To-Use Trademark Applications Are Not Evidence of Secondary Meaning, Commercial Strength, Or Goodwill As Of The Time Of The Alleged Infringement ............................................................................... | 3 |
| III. | Plaintiffs Fail To Establish Any Basis To Keep The Invalid Trademark Registration For The Upside-Down, Stylized SITUATION & Design Mark In The Case............................................................................................................................ | 6 |
| IV. | Plaintiffs' Exhibits Show A&F's Press Release Issued Subsequent To Its Offer ............. | 9 |
| V. | Plaintiffs Do Not Deny That Other Unsupported Allegations Should Be Stricken......... | 10 |
| VI. | Conclusion ......................................................................................................................... | 10 |

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Archer Daniels Midland Co. v. Narula*,
   2001 WL 804025 (N.D. Ill. 2001) ................................................................................................8

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ..................................................................................................10

*Gift of Learning Found., Inc. v. TGC Inc.*,
   329 F.3d 792 (11th Cir. 2003) ......................................................................................................4

*Green Bullion Fin. Servs. v. Money4Gold Holdings, Inc.*,
   639 F. Supp. 2d 1356 (S.D. Fla. 2009) .....................................................................................4, 5

*Haymaker Sports, Inc. v. Turian*,
   581 F.2d 257 (CCPA 1978) ..........................................................................................................6

*interState Net Bank v. NetB@nk, Inc.*,
   348 F.Supp.2d 340 (D.N.J. 2004) .............................................................................................6, 8

*Mincey v. Head*,
   206 F.3d 1106 (11th Cir. 2000) ................................................................................................6, 8

*Pilates, Inc. v. Current Concepts, Inc.*,
   120 F.Supp.2d 286 (SDNY 2000) ................................................................................................8

*Sugar Busters LLC v. Brennan*,
   177 F.3d 258 (5th Cir. 1999) ........................................................................................................7

**STATUTES**

15 U.S.C. § 1051(b) ...........................................................................................................................4

15 U.S.C. § 1051(c) ...........................................................................................................................4

15 U.S.C. § 1051(d) ...........................................................................................................................4

15 U.S.C. § 1060 ................................................................................................................................6

15 U.S.C. § 1115(a) ...........................................................................................................................9

Fla. Stat. §540.08(1) ..........................................................................................................................1

|  | PAGE |
|---|---|

**OTHER AUTHORITIES**

*McCarthy on Trademarks and Unfair Competition* § 18:11 ............................................................9

Trademark Manual of Examining Procedure § 503.01(c) ..............................................................8

Trademark Manual of Examining Procedure § 705..........................................................................5

Trademark Manual of Examining Procedure § 1207.01(d)(iii) .......................................................5

Defendants ("A&F") respectfully submit this reply in support of their motion to strike irrelevant material and unsupported allegations from Plaintiffs' Second Amended Complaint ("SAC"). Plaintiffs do not deny that many of the allegations in their SAC are both irrelevant and unsupported, and unnecessarily expand the litigation to the unfair prejudice of A&F. For the remaining allegations, Plaintiffs fail to establish any potential relevance sufficient to leave such unsupported allegations as part of the case.[1]

I.  **Plaintiffs Provide No Basis For Adding Their Voluntarily Dismissed "GTL" Claims Back Into The Case**

Plaintiffs' admission (at p. 8 of their response) that they do not have a Lanham Act claim regarding A&F's parody t-shirt bearing the phrase "GTL YOU KNOW THE DEAL FITCH," together with their voluntary dismissal of their GTL claims, and their use of the voluntary dismissal to block discovery of GTL documents from third parties Viacom and MTV, should prevent them from adding any GTL allegations back into the case. Given Plaintiffs' admission that they have no basis to assert trademark rights in "GTL," there can then be no basis to establish a right of publicity violation, especially where Plaintiffs cannot establish that "GTL" constitutes Sorrentino's "name, portrait, photograph, or other likeness." Fla. Stat. §540.08(1).[2] Moreover, Plaintiffs' allegations for its right of publicity claim do not refer to or rely on any

---

[1] A&F notes that the factual background section of Plaintiffs' response to A&F's motion contains numerous incorrect and unsupported factual allegations that are not related to the motion to strike. A&F does not respond to all of these factual allegations, but does note it has not admitted to using any of Plaintiffs' alleged trademarks (or that they are famous), and that Sorrentino can be seen wearing three different pairs of Abercrombie sweatpants over the course of the Aug. 11, 2011 Jersey Shore episode that prompted A&F's offer.

[2] Plaintiffs have pled no facts establishing that "GTL" which they admit is an acronym for "Gym Tan Laundry" (ECF No. 68 ¶ 3), is uniquely associated with Plaintiff Sorrentino, rather than the Jersey Shore show and cast, such that it is the equivalent of his "likeness."

alleged use of "GTL."³ (ECF No. 68 ¶¶ 78-84.)

Plaintiffs' voluntary dismissal with prejudice broadly included "*all claims <u>related</u>* to [Plaintiffs'] claim that Defendants infringed Plaintiffs rights in any registered and unregistered 'GTL' trademark." (ECF No. 51 p. 1) (emphasis added).⁴ Plaintiffs' retroactive attempt to now assert a right of publicity violation based on any alleged use of "GTL" is "related" to Plaintiffs' claims that they have trademark rights in GTL and is therefore encompassed within Plaintiffs' voluntary dismissal which was effective upon its filing. (*See* A&F's motion at pp. 1-2.)

Plaintiffs may not use their voluntary dismissal of their GTL claims to shield discovery of negative documents from MTV and Viacom, while attempting to still rely on their alleged rights in any GTL mark. Prior to Plaintiffs' voluntary dismissal, A&F had advised the court that Plaintiffs lacked rights in "GTL" because it was an acronym for the slogan, "Gym Tan Laundry," associated generally with the Jersey Shore show and used by the entire cast. (ECF No. 27 pp. 4-6.) Additionally, A&F noted that Viacom owned both a trademark registration and a pending application for "Gym Tan Laundry." (ECF Nos. 27-3, 27-4.) A&F had sought discovery of relevant GTL documents from MTV and Viacom before Plaintiffs dismissed their claim. (Bradley Decl. ¶ 2, Exs. 1-2.) However, during a meet and confer with counsel for MTV and Viacom, A&F learned that Plaintiffs' counsel had told MTV/Viacom that they were dropping their GTL claims and that MTV and Viacom therefore did not have to produce documents. (Bradley Decl. ¶¶ 4-5, Ex. 3.) After A&F's counsel inquired, Plaintiffs' counsel

---

³ Plaintiffs also baldly assert that their GTL allegations are also relevant to unspecified "related state common law claims" without any explanation of which claims they reference or how the unspecified state claims were not encompassed within their voluntary dismissal.

⁴ Plaintiffs incorrectly state that they dropped the Lanham Act claims relating to GTL from the SAC. Despite Plaintiffs' voluntary dismissal, allegations regarding GTL remain in the Lanham Act claims in the SAC. (ECF No. 68 ¶¶ 34-65 containing Plaintiffs' Lanham Act claims and including references to "GTL" and to Plaintiffs' "Marks" defined at ¶ 8 to include "GTL.")

2

confirmed their intention to drop their GTL claims, and A&F accordingly dropped its document requests to MTV and Viacom regarding the dismissed GTL claims. (Bradley Decl. ¶¶ 6-7, Ex. 4.) Having used their dismissal of GTL claims to avoid third party discovery relating to these claims, Plaintiffs should not now be allowed to add GTL claims back into the case.[5]

**II.     Plaintiffs' Irrelevant Pending Intent-To-Use Trademark Applications Are Not Evidence of Secondary Meaning, Commercial Strength, Or Goodwill As Of The Time Of The Alleged Infringement**

The majority of Plaintiffs' 17 trademark applications in Ex. A to their SAC were filed on an "intent to use" basis, without any evidence of use or any asserted date of first use.[6] Accordingly, a mere "intent to use" a mark without any *actual* use cannot establish secondary meaning, commercial strength or any goodwill in the alleged trademarks.[7] These unused trademarks for widely disparate goods and services have no possible relation to Plaintiffs' allegations which, Plaintiffs do not deny, relate only to clothing. Allowing these irrelevant registrations to remain in the case prejudices A&F by unnecessarily expanding the scope of the litigation and needlessly requiring A&F to defend against alleged trademarks that have no relation to the underlying dispute.

---

[5] If the Court were to allow Plaintiffs to add back these claims, then it should re-open fact discovery for the limited purpose of permitting A&F to issue and pursue a new subpoena for relevant material. We submit this would be time-consuming and would unfairly reward Plaintiffs' gamesmanship as to its on again, off again GTL claim.

[6] As in its motion to strike A&F focuses in this section on the irrelevant alleged "Situation" applications as the alleged "GTL" trademark applications should be stricken based on Plaintiffs' voluntary dismissal.

[7] Plaintiffs also provide no basis for how unused trademark applications demonstrate anything about A&F's intent (especially given that App. No. 85/405,939 was not filed and App. No. 85/156,576 was abandoned when the press release issued on Aug. 16, 2011) (ECF No. 72-2 pp. 14, 4), or how Plaintiffs' applications reveal anything about A&F's target consumers. Almost none of Plaintiffs' trademark applications had been filed in Feb. 2010 when A&F began offering its parody t-shirt. (ECF No. 72-2, *see* "filing date[s]" at pp. 2, 5, 8, 11, 14, 17, 20, 23, 26, 29.)

Six of the eight irrelevant trademark applications identified by A&F in its motion to strike were filed on an intent to use basis and Plaintiffs have not alleged any use either in their SAC or in a filing with the U.S. Patent & Trademark Office ("USPTO"). The intent to use basis for these applications is reflected in the USPTO TARR status report for each application (ECF No. 72-2 (Ex. 2 to A&F's Motion to Dismiss)) showing the filing "basis" as "1(b)"[8] and stating "date not available" for both the first use date and first use in commerce date.[9]

By definition "[s]econdary meaning is the connection in the consumer's mind between the mark and the product's producer." *Gift of Learning Found., Inc. v. TGC Inc.*, 329 F.3d 792, 800 (11th Cir. 2003) (no secondary meaning where plaintiff lacked "any evidence that the public associates the mark with [plaintiff's] business"). Where a mark has never been used in connection with the goods or services for which registration is sought, it is axiomatic that the consumer will not have made a connection between the alleged mark and the product's producer.[10] As noted by Plaintiffs, "strength in the marketplace" examines the "degree of

---

[8] Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b)(1) provides for "[a] person who has a bona fide *intention*… to use a trademark in commerce [to] [] request registration of its trademark." (emphasis added). An intent to use application will not be allowed to register until the applicant has made and demonstrated use of the applied for mark in commerce. *See* 15 U.S.C. 1051(c),(d). Plaintiffs have not alleged or shown any such use of these intent to use applications.

[9] App. No. 85/407,823 for various entertainment services (ECF No. 72-2, p. 6); App. No. 85/168,011 for dietary and nutritional supplements (*Id.*, pp. 24), App. No. 85/168,019 for jewelry (*Id.*, p. 21), App. Nos. 85/407,814 and 85/405,939 for various personal care products (*Id.*, pp. 12, 15), and App. No. 85/168,032 for printed material relating to field of diet, exercise, fitness, health, etc. (*Id.*, p. 18).

[10] As noted in *Green Bullion Fin. Servs. v. Money4Gold Holdings, Inc.*, 639 F. Supp. 2d 1356, 1363 (S.D. Fla. 2009), relied on by Plaintiffs, the analysis of whether a mark has acquired secondary meaning examines the following four factors: "(1) the length and manner of the mark's use, (2) the nature and extent of advertising, (3) efforts made by plaintiff to promote a conscious connection in the public's mind *between the mark and the service[/good] provided*, and (4) the extent to which the public actually identifies the mark with plaintiff's venture." (emphasis added). The face of Plaintiffs' exhibit, shows that the pending trademark applications have not been used so they cannot demonstrate any of these factors.

recognition in the minds of the relevant customer class." *Green Bullion Fin. Servs. v. Money4Gold Holdings, Inc.*, 639 F. Supp. 2d 1356, 1365 (S.D. Fla. 2009) (holding mark weak for the relevant time period despite evidence of extensive advertising and some use).  Where a mark has not been used, there is no recognition in the minds of the customer between Plaintiffs' alleged trademarks and the goods and/or services with which it has expressed only an intent to use.  Further, while the extent of third party use may be relevant to the strength of a mark, Plaintiffs' pending trademark applications for its alleged trademark do not demonstrate that third parties are not using their trademark, and thus are irrelevant to any issue of third party use.[11]  Accordingly, intent to use applications have no bearing on these issues or any other issue in this litigation.

Additionally, several of Plaintiffs' irrelevant trademark applications are facing office actions preventing their registration, as demonstrated on the page listing "current status" for each application.  (ECF No. 72-2 pp. 5, 23, 26.)  A USPTO examining attorney issues an office action against a pending application when he/she "determines that a mark is not entitled to registration, or that amendment is required" before an alleged mark is able to be registered.  Trademark Manual of Examining Procedure ("TMEP") § 705.[12]

---

[11] In an analogous situation the USPTO follows the rule that "[t]hird-party registrations that are not based on use in commerce, such as those registered under §66 of the Trademark Act (15 U.S.C. §1141f(a)), or those registered solely under §44 of the Trademark Act (15 U.S.C. §1126(e)), and for which no §8 affidavits of continuing use have been filed (15 U.S.C. §1058), *have very little, if any, persuasive value*."  TMEP § 1207.01(d)(iii) (emphasis added).  Accordingly, Plaintiffs' pending trademark applications for which no proof of use has been filed or asserted are entitled to even less persuasive value on the issue of any alleged lack of third party use.

[12] The USPTO Trademark Manual of Examining Procedure is a public manual available on the USPTO website at http://tess2.uspto.gov/tmdb/tmep/.

Far from showing any indication of secondary meaning, commercial strength or goodwill, Plaintiffs' irrelevant trademark applications only demonstrate that Plaintiffs have not yet used their alleged trademarks.

### III. Plaintiffs Fail To Establish Any Basis To Keep The Invalid Trademark Registration For The Upside-Down, Stylized SITUATION & Design Mark In The Case

In order to evidence that the necessary goodwill was transferred to effectuate a valid assignment of a trademark registration, Plaintiffs must demonstrate that they both a) use the assigned mark in Reg. No. 3,635,203 and that b) the assigned mark is being used in connection with the goods covered by the registration.[13]  15 U.S.C. § 1060 ("A registered mark … shall be assignable with the good will of the business in which *the mark is used*, or with that *part of the good will of the business connected with the use of and symbolized by the mark*") (emphasis added); *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (Fed. Cir. 1978) (assignment invalid where assignees "never used the mark themselves"); *interState Net Bank v. NetB@nk, Inc.*, 348 F.Supp.2d 340, 351 (D.N.J. 2004) (assignment invalid where assignee changed the format of the mark).  Plaintiffs do not deny that they are not using the assigned mark, *i.e.* the upside-down stylized SITUATION & Design Mark including a shaded rectangle, overlining, and stylized block letters:[14]

---

[13] As explained in A&F's motion to strike, (ECF No. 71 pp. 5-6), the mere fact that the assignment states that "goodwill" is transferred is insufficient unless some of Yak Shoes' business was actually transferred and/or Plaintiffs' continued to use the acquired registration in connection with substantially similar goods.  *See Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (CCPA 1978) ("Notwithstanding that the agreement recited pro forma that goodwill was transferred along with the mark," assignees had not used the mark or acquired any tangible assets and accordingly the assignment was invalid).  Plaintiffs have not alleged that any business was transferred, that they used the registered mark or that they operate any retail stores.

[14] As noted in A&F's reply in support of its motion to dismiss the SAC, even if Plaintiffs' validly acquired Reg. No. 3,635,203, the registration is limited to the mark in the stylized upside down



Plaintiffs allege use only of the unstylized mark "The Situation" and the intent to use various forms of "The Situation"[15] as depicted below, which do not establish any use of the assigned upside-down stylized SITUATION & Design Mark.

Additionally, it is not enough that the product on which Plaintiffs use the mark is related to the services covered by the assigned registration. The products or services need to be the same or substantially similar.  Plaintiffs' alleged use in connection with clothing is not similar enough to the "retail store services featuring men's, women's and children's apparel, footwear, and accessories" covered by Reg. No. 3,635,203 to be a valid assignment.[16]  *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 266 (5th Cir. 1999) ("retail store services featuring products and

---

(continued…)

format and did not convey any rights in use of the word "situation" alone.  (*See* ECF No. 77 pp. 2-3.)

[15] Plaintiffs' pending trademark applications for the various stylized versions of the alleged "The Situation" mark were all filed as "intent to use" applications and Plaintiffs have not yet provided any date of first use or evidence of use to the USPTO.  (ECF No. 72-2 pp. 6, 9, 12, 30, 34.) Additionally, as discussed in Section I,  of Plaintiffs' six pending applications for the unstylized "The Situation" mark, four of those applications were filed on an intent to use basis and no evidence of use has been filed or asserted with the USPTO.

[16] Plaintiffs are incorrect that Reg. No. 3,635,203 covers retail store services and clothing; the registration is limited to the services in International Class 35, i.e. the offering of retail store services that sell clothing.  Clothing itself is covered by a separate international class, Class 25, which is not included as part of the coverage of Reg. No. 3,635,203. (*See* the description of the coverage of International Classes 25 and 35 on the USPTO website at http://www.uspto.gov/trademarks/notices/international.jsp.)

7

supplies for diabetic people" not similar to sale of diet book that "help[s] treat diabetes and other diseases"); *interState Net Bank*, 348 F.Supp.2d at 349-50 (online point-of-purchase payment system services not similar to provider of traditional banking services over Internet). Even in the case relied on by Plaintiffs, *Archer Daniels Midland Co. v. Narula*, 2001 WL 804025, *7 (N.D. Ill. 2001), the Court found that the evidence seemed to indicate the products "may not be similar" where one was a "ready-made beverage meant for meal replacement" and other was "powders used to make beverages." Further, Sorrentino's use of the nickname "The Situation" prior to the assignment of the registration for, and Plaintiffs' failure to use, the assigned mark both demonstrate that the assignment was merely a naked purchase of a trademark which invalidates the assignment. *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 311 (SDNY 2000) (prior use of the term "shows that [plaintiff] sought only the ability to use the name…rather than the good will associated with it" and therefore was an invalid assignment in gross); *interState Net Bank*, 348 F.Supp.2d at 351 (assignment was to "obtain and use the NETBANK trademark without obtaining and using any of the goodwill accompanying that mark").

Plaintiffs also do not deny that the invalid assignment did not take place until June 7, 2011, long after Defendants introduced their parody t-shirts, which Plaintiffs acknowledge (at ¶ 13 of the SAC (ECF No. 68)) occurred in 2010. Therefore, even if valid, the registration would be irrelevant to Plaintiffs' claims as it does not establish the requisite ownership of valid trademark rights prior to Defendants' use.

Further, the USPTO's entry of an assignment into its record is a ministerial function, accomplished without any examination of the underlying transaction, and is therefore not evidence that the assignment was valid. The TMEP § 503.01(c) specifically provides that "[t]he Assignment Services Branch does not examine the substance of documents submitted for

recording. The act of recording a document is a ministerial act, and not a determination of the document's validity or of its effect on title to an application or registration." *See also McCarthy on Trademarks and Unfair Competition* § 18:11 ("USPTO recordation of an assignment does not mean that the assignment itself is valid"). Accordingly, the fact that MPS is listed as the owner of U.S. Registration No. 3,635,203 for the upside-down, stylized SITUATION & Design mark in the USPTO database is not evidence of the validity of the assignment or of whether Plaintiffs have standing to assert a claim based on the invalid registration. Separately, the prima facie validity provided to trademarks registered on the Lanham Act does not make a subsequent assignment valid, and as provided in § 33 of the Lanham Act "shall not preclude another person from proving any legal or equitable defense or defect." 15 U.S.C. § 1115(a).

Finally, ownership of any common law rights in the mark, "The Situation," if any, is not sufficient to keep an invalid registration for a different mark part of the case. Nor are any such common law rights, if any, relevant to a determination of whether an invalid registration for the wholly distinct upside down, stylized SITUATION & Design mark should remain part of the litigation.

**IV.     Plaintiffs' Exhibits Show A&F's Press Release Issued Subsequent To Its Offer**

Plaintiffs do not deny that their exhibits demonstrate that A&F issued its press release on August 16, 2011, which is subsequent to A&F's offer to Sorrentino and other Jersey Shore castmates, made on August 15, 2011 in the letter to MTV. Additionally, contrary to Plaintiffs' incorrect assertion, A&F's website lists the date of the press release as Aug. 16, 2011. (*See* Bradley Decl. Ex. 5.) Plaintiffs contradictorily argue that the date has little impact upon its claim while at the same time using the date issue as the basis for claiming that A&F's press release was false and a fabrication. The actual timeline is not in dispute. Plaintiffs admit that A&F sent a

9

letter to MTV on August 15, 2011. (ECF No. 76 p. 13.)  The existence of the August 15, 2011 letter to MTV is both alleged by Plaintiffs in their SAC and the letter is also incorporated by reference in the SAC.  (ECF No. 68 ¶ 25.)[17]  On its face the letter to MTV contains an offer both to Sorrentino and to MTV.  (ECF No. 71-1.)  Subsequent to making its offer in the letter to MTV, A&F then issued a press release the next day on August 16, 2011 regarding the offer made on August 15, 2011.  (ECF No. 68-2 p. 2 (by-line of A&F's press release bears the date Aug. 16, 2011 at 6:50pm); ECF Nos. 68-2 p. 4 and 68-6 p. 2 (news articles dated Aug. 18, 2011 stating that A&F's press release was issued on "Tuesday" which was August 16, 2011).)  Discovery has ended and there is no chronology that needs to be cleared up, as the true chronology has already been demonstrated by Plaintiffs' own exhibits, and the August 12, 2011 date has been acknowledged by Plaintiffs' counsel as a typographical error.  (ECF No. 72-6.)[18]

## V.     Plaintiffs Do Not Deny That Other Unsupported Allegations Should Be Stricken

Plaintiffs do not deny that allegations 3, 4, 7, 8, 9, 10, and 11 listed at p. 10 of A&F's motion, (ECF No. 71), are either irrelevant and/or unsupported and therefore should be stricken.

## VI.    Conclusion

For the foregoing reasons, A&F respectfully requests that the Court grant its motion to strike.

---

[17] Plaintiffs incorrectly allege at ¶ 25 of the SAC that they attached a copy of the letter to MTV as Ex. C, but instead they attached a copy of A&F's September 15, 2011 response to Plaintiffs' cease and desist letter.  (ECF No. 68-3.)  Accordingly, A&F attached a true and correct copy of the August 15, 2011 letter to MTV as Ex. 1 to their motion to dismiss.  (ECF No. 71-1.)

[18] The Court may take judicial notice of facts that are not "subject to reasonable dispute." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  Under Fed. R. Evid. 201, a fact is not subject to reasonable dispute when it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  The August 16, 2012 date is capable of accurate and ready determination both from Plaintiffs' exhibits and from Plaintiffs' counsel acknowledgement of the date.  *See Mincey v. Head*, 206 F.3d 1106, 1130 fn. 58 (11th Cir. 2000) (taking judicial notice of date and time as reported on newswire and similar sources).

Dated:   July 26, 2012

Respectfully submitted,

s/ Gerald J. Houlihan
Gerald J. Houlihan (Florida Bar No. 0458430)
Email:  houlihan@houlihanlaw.com
Houlihan & Partners, P.A.
504 Aragon Avenue
Miami, Florida 33134
Telephone:    (305) 460-4091
Facsimile:    (305) 397-0955

John G. Froemming, Esq. (*pro hac vice*)
Email:  jfroemming@jonesday.com
Jessica D. Bradley, Esq. (*pro hac vice*)
Email:  jbradley@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:    202-879-4693
Facsimile:    202-626-1700

Attorneys for Abercrombie & Fitch Stores, Inc. and Abercrombie & Fitch Co.

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

s/ Gerald Houlihan<br>Gerald J. Houlihan

## SERVICE LIST

Richard Charles Wolfe, Esq.  
Email:  rwolfe@wolfelawmiami.com  
Darren Adam Heitner, Esq.  
Email:  dheitner@wolfelawmiami.com  
Wolfe Law Miami, P.A.  
175 SW 7 Street, Penthouse 2410  
Miami, FL 33131  
Telephone:    305-384-7370  
Facsimile:    305-384-7371  

Attorneys for MPS Entertainment, LLC  
and Michael P. Sorrentino

12