**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 11-24110-CIV-O'SULLIVAN
[CONSENT]

**MPS ENTERTAINMENT, LLC and**
**MICHAEL P. SORRENTINO,**

       Plaintiffs,

v.

**ABERCROMBIE & FITCH STORES,**
**INC. and ABERCROMBIE & FITCH**
**CO.,**

       Defendants.

/

## <u>ORDER</u>

**THIS CAUSE** is before the Court on the Defendants' Motion for Summary Judgment ("Motion," DE# 93, 11/1/12), which contains the defendants' Statement of Undisputed Facts ("SUMF"). The plaintiffs filed their response ("Response," DE# 100, 11/20/12), to which the defendants filed their reply (DE# 109, 11/20/12). Additionally, the plaintiffs filed Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (DE# 99, 11/20/13). Having reviewed the Motion, Response, Reply, the SUMF and the plaintiffs' response thereto, and the record, the Court grants the Defendants' Motion for Summary Judgment ("Motion," DE# 93, 11/1/12) as more fully discussed below.

I.      **Background**[1]

This case involves trademark infringement and related claims by a public figure alleging that a clothing company used his nickname and trademark on a t-shirt and in an advertisement to sell its products.  The plaintiff, Michael Sorrentino, regularly appeared on the television show "Jersey Shore," which first aired on MTV Networks[2] on December 3, 2009.  Sorrentino and his brother Marc Sorrentino own the plaintiff MPS Entertainment, LLC, which is a limited liability company engaged in the business of developing, marketing, and distributing goods and services.  The defendant, Abercrombie & Fitch Co., is the parent company of Defendant Abercrombie & Fitch Stores, Inc. (collectively, "A&F"), and A&F produces, markets, distributes, and sells clothing at retail stores.  Plaintiffs' claims relate to a t-shirt created and sold by A&F that had the phrase "The Fitchuation" on the front of the shirt and to a press release issued by A&F, which the plaintiffs contend constituted an advertisement for A&F's products.

A.      **"The Fitchuation" T-shirt**

The plaintiff Michael Sorrentino uses the nicknames "The Situation" and "Mike The Situation."  Sorrentino gave himself the nickname "The Situation" based on an association with his abdominal muscles.

On January 28, 2010, A&F placed an order for a t-shirt bearing the phrase "The

---

[1]      The facts contained in this section are taken from the Statements of Undisputed Material Facts ("SUMF"), which Defendants filed as part of their Motion (see Motion, D.E. 93, at CM/ECF pp. 28-38) and Plaintiffs filed separately from their Response (see D.E. 99, at 1-11), and are undisputed unless otherwise noted.  Defendants also filed a summary chart of the statements of undisputed facts.  (See D.E. 110, at 1-30.)

[2]      MTV Networks, a division of Viacom, Inc., co-produces and broadcasts Jersey Shore.

Fitchuation" on the front of the shirt.  A&F explains that "'The Fitchuation' was a play on

words or parody of Mr. Sorrentino's nickname 'The Situation.'  A&F was making fun of Mr.

Sorrentino giving his abs the nickname 'The Situation,' and used wordplay to create a

fanciful word using A&F's brand name."[3]  (Statement of Undisputed Facts, D.E. 93, ¶ 4.)

_____

[3]      Plaintiffs assert that they dispute A&F's explanation of the meaning of "The Fitchuation."  Plaintiffs state:

> Mr. Wilson's 'spin' on the exact wording of the Abercrombie t-shirt (that merely says 'The Fitchuation') and whether or not it is a parody is a question for the jury to decide.  The affirmative defense of fair use/parody is a mixed question of law and fact as to which the proponent carries the burden of proof.

(Response to Statement of Undisputed Facts, D.E. 99, ¶ 4 (citing cases).)

Without providing any details of the content contained therein, the plaintiffs also refer the Court to the "Deposition of Marc Sorrentino attached hereto as Exhibit 'A' 114:17-115:3, 116:13-19; 118:4-19."  (Id.)  However, the plaintiffs did not attach any exhibits to its Response to the Statement of Undisputed Facts.  The plaintiffs originally filed six exhibits as a separate filing attached to a declaration of Richard Wolfe (D.E. 101).  However, the plaintiffs filed a Notice of Striking that filing on November 26, 2012 (D.E. 103), and these exhibits do not contain the cited pages of Marc Sorrentino's deposition.  The plaintiffs filed additional exhibits as a separate filing on November 26, 2012 (D.E. 106-1, 106-2).  The Court has reviewed the plaintiffs' exhibits and has not found the cited pages of Marc Sorrentino's deposition.  Exhibit A consists of excerpts from a deposition of Michael Kagan, and the excerpts do not contain pages 114, 115, 116, or 118.  (See D.E. 106-1, at CM/ECF p. 4.)  Exhibit G is a two-page excerpt from the deposition of Marc Sorrentino; however, the exhibit consists only of the cover page of the deposition transcript, lines 22 through 25 of page 295, and lines 1 through 25 of page 296.  (See id. at CM/ECF p. 86-87.)  The Court has also reviewed the defendants' exhibits and has not found the cited pages of Marc Sorrentino's deposition.  The defendants filed excerpts of Marc Sorrentino's deposition in support of their Motion for Summary Judgment as Exhibit 1, but these excerpts do not contain pages 114, 115, 116, or 118.  (See Motion Ex. 1, D.E. 93-2, at CM/ECF p. 2-37.)  Finally, the Court has reviewed the exhibits attached to the Plaintiffs' Second Amended Complaint, which also does not contain the cited pages of Marc Sorrentino's deposition.  (See D.E. 68.)

Under Rule 56(e)(2) of the Federal Rules of Civil Procedure, "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion."  Here, the Court considers as undisputed the fact that the plaintiff Sorrentino gave his abdominal muscles the nickname "The Situation" and that the phrase "The Fitchuation" was created using part of A&F's brand name with part of the plaintiff Sorrentino's nickname.  The Court also notes that in their Response to the Statement of Undisputed Facts, the plaintiffs discuss the origin of the nickname, stating "While 'The Situation' may have originated based on an association with his abs, it is also

A&F began selling the t-shirt in February 2010 exclusively through its Abercrombie & Fitch branded stores and website.  A&F does not engage in any conventional advertising, and it did not advertise "The Fitchuation" t-shirt.  All but four of the shirt sales were made by December 2010, and the remaining four shirt sales were made by June 2011.

On October 19, 2010, the plaintiffs filed an application to register "The Situation" as a trademark covering entertainment services.  The plaintiff MPS currently sells t-shirts on its website, http://www.officialsituation.com.  One t-shirt sold by the plaintiff MPS is called the "Official Situation Logo T-shirt," which contains the words "The Situation" and "Official Situation Nation."  (See Motion Ex. 42, D.E. 93-6, at CM/ECF p. 21.)  The plaintiffs have never used the phrase "The Fitchuation."

**B.     Press Release / Advertisement**

On the episode of Jersey Shore airing on August 11, 2011, Sorrentino wore at least one pair of A&F-branded sweatpants.[4]  Four days later, on August 15, 2011,[5] A&F sent a letter via overnight Federal Express to MTV Networks, in which A&F stated that it would

---

Sorrentino's trademark and he is specially known as the Situation."  (Response to Statement of Undisputed Facts, D.E. 99, ¶ 57.)  In support of this statement, the plaintiffs again cite to exhibits that do not correspond to exhibits they filed in support of their response.  (See id.)

[4]     The parties dispute the number of pairs of A&F-branded sweatpants worn by Sorrentino in the episode.  The plaintiffs claim that Sorrentino wore only one pair of A&F-branded sweatpants during the episode, whereas the defendants claim that Sorrentino wore three pairs of A&F-branded sweatpants.  (See Statement of Undisputed Facts, D.E. 93, ¶ 15; Response to Statement of Undisputed Facts, D.E. 99, ¶ 15.)

[5]     The Statement of Undisputed Facts contains a typographical error on the date A&F sent the letter, stating the date of the letter as August 15, 2012.  (See Statement of Undisputed Facts, D.E. 92, ¶ 16.)  The Court's review of the record, including the exhibits attached to the declaration of Reid Wilson that Defendants cited in their Statement of Undisputed Facts, shows that the date of the letter is August 15, 2011.  (See Reid Wilson Decl., Ex. A, D.E. 93-8, at CM/ECF p. 12.)

be willing to pay MTV, Sorrentino, or other characters on the show up to $10,000 not to wear any clothing bearing trademarks owned by A&F.  The body of the letter stated, in relevant part, as follows:

> I am reaching out to you on behalf of Abercrombie & Fitch Co. ("A&F") to address a matter with respect to one of the shows aired by MTV Networks, namely "Jersey Shore."  We have been disturbed to see that one of the characters on the show, Michael Sorrentino (better known as "The Situation"), has been prominently wearing A&F clothing on a number of episodes aired to date this season.
>
> A&F obviously has not sought product placement on the show, and we believe that, since the character portrayed by Mr. Sorrentino is not brand appropriate, his display of A&F clothing could be misconstrued as an endorsement by him of our clothing or – worse – an endorsement by A&F of his wearing our clothing.
>
> We have no interest at this point in pursuing any sort of legal action against MTV or the producers of "Jersey Shore."  In fact, we would be willing to pay MTV or Mr. Sorrentino or other characters up to $10,000 NOT to wear any clothing bearing the "ABERCROMBIE & FITCH," "A&F," "FITCH," "MOOSE" or related trademarks.  For additional episodes aired this season, we would appreciate it if you would ensure that our brands are pixilated or otherwise appropriately masked.

(Reid Wilson Decl., Ex. A, DE # 93-8, at CM/ECF p. 12.)  MTV Networks received the letter the next morning, on August 16, 2011, at 9:01 a.m.[6]

Later that same day, on August 16, 2011 at 6:13 p.m., A&F issued a press release referring to Sorrentino.[7]  The press release stated as follows:

---

[6]   The Statement of Undisputed Facts contains a typographical error on the date MTV Networks received A&F's letter, stating the date of the receipt as August 16, 2012.  (See Statement of Undisputed Facts, D.E. 92, ¶ 16.)  The Court's review of the record, including the exhibits attached to the declaration of Reid Wilson that the defendants cited in their Statement of Undisputed Facts, shows that the date of receipt is August 16, 2011.  (See Reid Wilson Decl., Ex. B, DE# 93-8, at CM/ECF p. 14.)

[7]   The plaintiffs dispute this fact and state that "[o]n its face, the Press Release is dated August 12, 2011.  (Response to Statement of Undisputed Facts, D.E. 99, ¶ 18.)  Upon review of the record, the Court finds that there is no genuine dispute of fact as to the date A&F issued its press release.

ABERCROMBIE & FITCH PROPOSES A WIN-WIN SITUATION

New Albany, Ohio, August 12, 2011: Abercrombie & Fitch Co. (NYSE: ANF) today reported that it has offered compensation to Michael 'The Situation' Sorrentino, a character in MTV's TV show *The Jersey Shore* to cease wearing A&F products.

A spokesperson for Abercrombie & Fitch commented:

"We are deeply concerned that Mr. Sorrentino's association with our brand could cause significant damage to our image. We understand that the show is for entertainment purposes, but believe this association is contrary to the aspirational nature of our brand, and may be distressing to many of our fans. We have therefore offered a substantial payment to Michael 'The Situation' Sorrentino and the producers of MTV's *The Jersey Shore* to have the character wear an alternate brand. We have also extended this offer to other members of the cast, and are urgently waiting a response."

Abercrombie & Fitch
Brand Senses Department
(614) 283-6500

*At the end of the second quarter, the Company operated a total of 1,073 stores. The Company operated 316 Abercrombie & Fitch stores, 179 abercrombie kids stores, 501 Hollister Co. stores and 18 Gilly Hicks stores in the United States. The Company operated 10 Abercrombie & Fitch stores, four abercrombie kids stores, 44 Hollister Co. stores and one Gilly Hicks store internationally. The Company operates e-commerce websites at www.abercrombie.com, www.abercrombiekids.com, www.hollisterco.com and www.gillyhicks.com.*

(Motion Ex. 20, DE# 93-4, at CM/ECF p. 23; Reid Wilson Decl., Ex. C, DE# 93-8, at CM/ECF p. 17.) The italicized paragraph in the press release is "standard boilerplate that goes at the end of every press release" issued by A&F. (Statement of Undisputed Facts, D.E. 93, ¶ 24.) The press release did not contain any video, photographs, or images of

---

The press release bears the August 16, 2011 date (see Motion Ex. 20, D.E. 93-4, at CM/ECF p. 23), A&F's distribution document explicitly states "Publish date & time 06:13PM EDT 08/16/2011" (see Reid Wilson Decl., Ex. D, 93-8, at CM/ECF p. 19), Plaintiffs do not dispute how the press release was distributed (see Response to Statement of Undisputed Facts ¶ 19), and counsel for A&F stated in a deposition that the August 12, 2011 date that was printed on the press release was a "typographical mistake" (see Motion Ex. 32, Reid Wilson Dep., D.E. 93-5, at 107:22-109:7).

Sorrentino.

## II.   Complaint, Motion, and Response

On June 15, 2012, Plaintiffs filed their Second Amended Complaint ("Complaint," DE# 68), wherein they raised the following six claims against both of the defendants: (1) trademark infringement under common law; (2) unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a)[8]; (3) false advertising in violation of 15 U.S.C. § 1125(a); (4) unfair competition under Florida Statute Section 495.151; (5) common law injury to business reputation; and (6) misappropriation of likeness for commercial purposes in violation of Florida Statute Section 540.08.  (See Compl. ¶¶ 34-70, 77-84.)  In addition, the plaintiffs raised the following three claims against the defendant Abercrombie & Fitch Co.: (1) deceptive, false, and misleading advertising in violation of Florida Statute Section 495.151; (2) illegal use of name in commerce under the common law; and (3) deceptive, false, and misleading advertising in violation of Florida Statute Section 817.41.  (See id. ¶¶ 71-76, 85-92.)[9]

On November 1, 2012, the defendants moved for summary judgment on all claims.

---

[8]      The plaintiffs title this count as including a false advertising claim under 15 U.S.C. § 1125(a), but they provide no facts supporting this claim in Count II, and they separately allege a false advertising claim under 15 U.S.C. § 1125(a) in Count III.  (See Compl. ¶¶ 47-65.)

[9]      The plaintiffs' Second Amended Complaint appears to raise claims related to two trademarks – "The Situation" and "GTL."  (See Compl. ¶¶ 3, 8, 35, 36, 61.)  However, on May 16, 2012, the plaintiffs filed a Notice of Voluntary Dismissal (D.E. 51), wherein the plaintiffs "voluntarily dismiss[ed] all claims related to their claim that Defendants infringed Plaintiffs['] rights in any registered and unregistered 'GTL' trademark, from this action with prejudice." Citing to the Plaintiffs' Notice of Voluntary Dismissal, A&F did not address any of the plaintiffs' claims related to the "GTL" trademark in its Motion (see Motion 8 n.12), and the plaintiffs did not make any argument related to the "GTL" mark in their Response (see generally Response). The Court likewise treats all of the plaintiffs' claims related to the "GTL" mark as dismissed.

The defendants argue that "[a]s for Plaintiffs' trademark infringement claims, the August 15, 2011 press release, in criticizing Plaintiff Michael 'The Situation' Sorrentino as contrary to A&F's brand image, could not possibly have created a likelihood of confusion that the press release was nevertheless issued or approved by Sorrentino." (Motion for Summary Judgment p. 1, DE# 93, 11/2/12) The defendants also argue that the "Fitchuation" t-shirt was a "play on words or parody between the words 'Fitch' and 'Situation'" and "cannot establish likelihood of confusion under well-established Eleventh Circuit law." (Id.) The defendants further argue that the plaintiffs "do not have a 'right of publicity' claim" because "the press release does not directly promote a product or service" and it "explicitly attempted to disassociate his name from A&F's brand." (Id.) In their Response, the plaintiffs argue that "there are genuine issues of material fact" on all claims that preclude summary judgment for the defendants. (Response p. 1, DE# 100, 11/20/12)

## III.    Legal Standards

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential

element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).  The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  Id. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324; see also FED. R. CIV. P. 56(c).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial."  Id. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Id.

## IV.     Discussion

### A.     Trademark Infringement

The plaintiffs claim that A&F infringed on their trademark "The Situation" by using the mark on their t-shirt and in their advertising campaign.    To establish a trademark infringement claim under the Lanham Act or the common law, "a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'"[10] Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647-48 (11th Cir. 2007) (quoting Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997)) (citing SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1334 (11th Cir. 1996)).   To show "proof of a valid trademark[,] a plaintiff need not have a registered mark." Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010).   "'[T]he use of another's unregistered, i.e., common law, trademark can constitute a violation of [the Lanham Act] where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks

---

[10]     The Eleventh Circuit and Florida state courts apply the same standards to a trademark infringement claim under the Lanham Act as to one brought under the common law. See Natural Answers, Inc. v. SmithKlineBeecham Corp., 529 F.3d 1325, 1332-33 (11th Cir. 2008) (stating that "[s]ince Natural Answers is unable to bring an unfair competition claim under the Lanham Act under the theory of either false advertising or trademark infringement, it follows that the common law claims based on unfair competition and trademark infringement must fail as well"); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition.") (quoting Investacorp, Inc. v. Arabian Inv. Banking Corp. E.C., 931 F.2d 1519, 1521 (11th Cir. 1991)); Anderson v. Upper Keys Bus. Grp., Inc., 61 So. 3d 1162, 1167 (Fla. 3d DCA 2011); Bavaro Palace, S.A. v. Vacation Tours, Inc., 203 F. App'x 252, 256 (11th Cir. 2006) (stating that "the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim" (quoting Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 802 (11th Cir. 2003)).

by another company constitutes a false representation that its goods came from the same source.'" Id. (quoting Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512-13 (11th Cir. 1984)). "However, only those marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." Id. at 773-74 (citing 15 U.S.C. § 1052(e), (f); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); Coach House Rest., Inc. v. Coach & Six Rests., Inc., 934 F.2d 1551, 1559 (11th Cir. 1991)).

The defendants argue that "The Situation" is not eligible for trademark protection because "The Situation" is a personal name and therefore "merely descriptive." (Motion 4.) The plaintiffs argue that "The Situation" is eligible for trademark protection because it is "suggestive" or "arbitrary or fanciful." (Response 11.) There are "four categories of distinctiveness, listed in ascending order of strength: '(1) generic – marks that suggest the basic nature of the product or service; (2) descriptive – marks that identify the characteristic or quality of a product or service; (3) suggestive – marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful – marks that bear no relationship to the product or service, and the strongest category of trademarks.'" Id. at 774 (quoting Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 797-98 (11th Cir. 2003)). "Suggestive and arbitrary or fanciful marks are deemed 'inherently distinctive' because 'their intrinsic nature serves to identify a particular source of a product' and are generally entitled to trademark protection." Id. (quoting Two Pesos, 505 U.S. at 768); see also Knights Armament Co. v. Optical Sys. Tech., Inc., 654 F.3d 1179, 1188 (11th Cir. 2011) (stating that "[b]ecause a suggestive [trademark] is inherently distinctive, no proof of secondary

11

meaning is required for it to be protectable" (quoting Coach House Rest., 934 F.2d at 1560)); Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 938 (11th Cir. 2010) (stating that "Kodak" is an example of an arbitrary or fanciful mark and that "Penguin Refrigerators" is an example of a suggestive mark). "Generic marks, on the other hand, are generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act." Tana, 611 F.3d at 774 (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007); Coach House Rest., 934 F.2d at 1560). "Descriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring 'secondary meaning.'" Id. (quoting 15 U.S.C. § 1052(f)) (citing Coach House Rest., 934 F.2d at 1560); see also Caliber, 605 F.3d at 938 (stating that "Vision Center" is an example of a descriptive mark). "'A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer.'" Id. (quoting Welding Servs., 509 F.3d at 1358).

"[T]he touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." Custom Mfg. And Eng'g, Inc. v. Midway, 508 F.3d 641, 647 (11th Cir. 2007) (citation omitted). "Although likelihood of confusion is a question of fact, it may be decided as a matter of law."[11] Tana, 611 F.3d at 775 n.7 (citing Welding Servs., 509 F.3d

---

[11]     "The likelihood-of-confusion multifactor test presupposes that various factors will point in opposing directions. The role of the court in reviewing a motion for summary judgment is to determine the ultimate question of whether, in light of the evidence as a whole, there is sufficient proof of a likelihood of confusion to warrant a trial of the issue." Tana, 611 F.3d at 775 n.7 (citing Welding Servs., 509 F.3d at 1361).

at 1361; <u>Alliance Metals, Inc. v. Hinely Indus., Inc.</u>, 222 F.3d 895, 907 (11th Cir. 2000)).

To determine whether a likelihood of confusion exists, the Court considers seven factors:

> (1) the type of mark (in short, whether the "relationship between the name and the service or good it describes" is such that the chosen name qualifies as generic, descriptive, suggestive, or arbitrary); (2) the similarity of the marks (based on "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used"); (3) the similarity of the goods ("whether the products are the kind that the public attributes to a single source"); (4) the similarity of the parties' retail outlets, trade channels, and customers ("consider[ing] where, how, and to whom the parties' products are sold"); (5) the similarity of advertising media (examining "each party's method of advertising" to determine "whether there is likely to be significant enough overlap" in the respective target audiences such "that a possibility of confusion could result"); (6) the defendant's intent (determining whether the defendant had a "conscious intent to capitalize on [the plaintiff's] business reputation," was "intentionally blind," or otherwise manifested "improper intent"); and (7) actual confusion (that is, whether there is evidence that consumers were actually confused).

<u>Custom Mfg.</u>, 508 F.3d at 648 (citing <u>Frehling Enters., Inc. v. Int'l Select Grp., Inc.</u>, 192 F.3d 1330, 1335-41 (11th Cir. 1999)). Generally, the type of mark and evidence of actual confusion are the most important factors. <u>Dieter v. B & H Ind. of Sw. Fla., Inc.</u>, 880 F.2d 322, 326 (11th Cir. 1989). However, a court must consider the circumstances of each particular case, and evaluate the weight to be accorded to individual subsidiary facts, in order to make its ultimate factual decision. <u>Jellibeans, Inc. v. Skating Clubs of Ga.</u>, 716 F.2d 833, 840 n. 17 (11th Cir. 1983).

### 1.    "The Fitchuation" T-shirt

#### a.    Strength of the Mark (Factor One)

"[D]etermining the strength of a mark requires a consideration of the mark's inherent distinctiveness." <u>Tana</u>, 611 F.3d at 776. "If the mark is merely descriptive, such as a personal or surname, its strength depends on whether it has acquired secondary meaning."

Id. (citing Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990); Tonawanda St. Corp. v. Fay's Drug Co., Inc., 842 F.2d 643, 648 (2d Cir. 1988); Conagra, 743 F.2d at 1513). "A descriptive mark with secondary meaning is a relatively strong mark." Id. (citing Dieter, 880 F.2d at 329).

With regard to the mark's distinctiveness, the Court finds that "The Situation" is an "arbitrary or fanciful" mark because it "bear[s] no relationship to the product or service." Tana, 611 F.3d at 774. Although the word "situation" is not a word that was coined or made up by the plaintiffs, or a word that is obsolete, totally unknown in the language or out of common usage, the Court can discern no relationship between the word "situation" and the apparel or entertainment services that the plaintiffs provide.

The defendants also argue that the plaintiffs did not have enforceable trademark rights in the mark or name "The Situation" because the plaintiffs did not timely develop trademark rights in the personal name "The Situation." (Motion 8-9.) The plaintiffs argue that they "own a federally registered mark for the trademark 'The Situation' for use on clothing . . . , which is prima facie evidence of the Mark's validity." (Response 12.) "Common-law trademark rights are 'appropriated only through actual prior use in commerce.'" Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1321 (11th Cir. 2011) (quoting Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193-94 (11th Cir. 2001)). "Trademark ownership is always appurtenant to commercial activity." Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022 (11th Cir. 1989). "'The use of a mark in commerce . . . must be sufficient to establish ownership rights for a plaintiff to recover against subsequent users under [the Lanham Act].'" Crystal Entm't & Filmworks, 643 F.3d at 1321 (quoting Planetary Motion, 261 F.3d at 1195). Courts in this circuit

14

"appl[y] a two-part test to determine whether a party has proved 'prior use' of a mark sufficient to establish ownership: 'Evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" Id. (quoting Planetary Motion, 261 F.3d at 1195).  "Under [a] 'totality of circumstances' analysis, a party may establish 'use in commerce' even in the absence of sales." Planetary Motion, 261 F.3d at 1195.  "Although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case." Id. (quotation omitted).

Here, A&F ordered its "The Fitchuation" t-shirt on January 28, 2010, and A&F began selling the shirt in its stores and on its website in February 2010.  All but four of the shirt sales were made by December 2010, and the four remaining shirt sales were made by June 2011.  At the time A&F began selling its "The Fitchuation" t-shirt in February 2010, Plaintiffs had not used "The Situation" on a t-shirt or any other apparel.  "MPS and its sister company Naughty Unlimited began designing t-shirts containing '[T]he Situation' mark in or about January 2010." (Motion Ex. 34 (Plaintiffs' Responses to Interrogatories, D.E. 93-5, at 2.)  The plaintiffs admit that MPS began using "The Situation" as a trademark on apparel on or about June 3, 2010, when it entered into an agreement with Luxury Laces. (Id.)  "MPS also began to sell T-shirts using the mark[ ] on its website, http://www.officialsituation.com, and MPS printed t-shirts for sale on its website commencing in late 2010." (Id.)  Because the Court finds "The Situation" an arbitrary and fanciful mark, this factor weighs in favor of the plaintiffs.

### b.    Similarity of the Mark (Factor Two)

"When analyzing the similarity of the mark, the court must consider 'the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed.'" Caliber, 605 F.3d at 939 (quoting E. Remy Martin & Co. v. Shaw-Ross Int'l Imps., Inc., 756 F.2d 1525, 1531 (11th Cir. 1985)).  The defendant maintains that the t-shirt is a parody.  A parody "must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable." Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1271 (11th Cir. 2001)(copyright case); Louis Vuitton, 507 F.3d at 259 ("necessary ... to conjure up the original designer mark for there to be a parody at all"); Cliff Notes, Inc v. Bantam Doubleday Dell Publishing Group, Inc., 886 F.2d 490, 495 (2d Cir. 1989)("[P]arody is entitled at least to conjure up the original.")(citation omitted).

The target of A&F's parody is "The Situation."   The t-shirt expresses "The Fitchuation" visually and phonetically different than "The Situation."  (SUMF ¶ 4; Wilson Decl. Ex. H).   There is no evidence of A&F "palming off" its t-shirt as that of the plaintiffs where, as here, the t-shirt has the A&F inside label and prominently uses A&F's own famous trademark "Fitch" as part of the parody.  (Wilson Decl. Ex. H; SUMF ¶¶ 10-13). See Custom Mfg., 508 F.3d 652 n.10 (affirming summary judgment and finding that use of house brand significant in reducing likelihood that consumers would be confused as to source); Tiger Direct, Inc. v. Apple Computer, Inc., 2005 WL 1458046, *16 (S.D. Fla. 2005)(J. Lenard)(finding the parties' marks "distinctly different" where defendant Apple's use occurred in an "Apple-branded environment").  This factor weighs in favor of A&F.

16

### c.   Comparison of the Goods and Services (Factor Three)

"Analyzing the similarity of the products the marks represent 'requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties.'" Caliber, 605 F.3d at 939-40 (quoting Frehling Enters., 192 F.3d at 1338).  "'[T]he test [is] not whether the goods could be distinguished . . . but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods.'" Id. at 940 (quoting Frehling Enters., 192 F.3d at 1338).  In cases of parody, even identical products have been treated as a neutral factor.  See Jordache Ents., 828 f.2d 1483-84 (Jordache and "Lardashe" Jeans); Black Dog Tavern Co. v. Hall, 823 F. Supp. 48 (D. Mass. 1993) (Black Dog and "Dead Dog" t-shirts).

A&F's apparel goods are dissimilar to the plaintiffs' entertainment services.  The plaintiffs concede that they did not offer apparel under a "Situation" mark until after A&F introduced "The Fitchuation" t-shirt.  There is no evidence that the public attributes the parties' respective goods and services to the same single source.  (SUMF ¶¶ 1-3,9-10, 58-59, 61).  This factor weighs in favor of A&F.

### d.   Similarity of the Parties' Retail Outlets and Customers (Factor Four)

"The similarity of the parties' retail outlets and customers 'takes into consideration where, how, and to whom the parties' products are sold.'" Caliber, 605 F.3d at 940 (quoting Frehling Enters., 192 F.3d at 1339).  A&F sold "The Fitchuation" t-shirt and its other products exclusively through its A&F branded stores and website (SUMF ¶ 5).  The

17

plaintiffs offered "The Situation" entertainment services to bars, nightclubs and similar venues. (SUMF ¶ 60)   A&F's predominant customers are aged 15-22, while Mr. Sorrentino's predominant customers are entertainment businesses whose patrons are 18-34 year olds.  (SUMF ¶¶ 8,60,63). The plaintiffs did not offer apparel until after A&F introduced its parody t-shirt, and even then only on their website, officialsituation.com. (SUMF ¶¶ 9,61-62, 2).  "Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake or deception." <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 f.2d 252, 262 (5th Cir. 1980); <u>Freedom Sav. & Loan Assoc. v. Way</u>, 757 f.2d 1176, 1184 (11th Cir. 1985).  This factor weighs in favor of A&F.

### e.    Similarity of Advertising Media (Factor Five)

This factor considers each parties' method of advertising its respective products. <u>See</u>, <u>Caliber</u>, 605 F.3d at 940; <u>Frehling Enters.</u>, 192 F.3d at 1339.  The plaintiffs and the defendants do not engage in similar methods of advertising.  The plaintiffs assert that they "market and promote 'The Situation' trademark in a variety of ways, including but not limited to social media (Facebook, Twitter, etc.), on Sorrentino's official website, on promotional fliers and marketing materials for Sorrentino's public appearances." (Response to Statement of Undisputed Facts, D.E. 99, ¶ 65.)  The plaintiffs do not sell any products in retail stores.  (<u>Id.</u> ¶ 68.)  There is no evidence that the plaintiffs advertised anything but their entertainment services, and only after A&F introduced "The Fitchuation" t-shirt. (<u>Id.</u> ¶¶ 58-60).   In contrast, the defendants "do not engage in conventional advertising, and consider[ ] the in-store experience to be its primary marketing vehicle." (SUMF, D.E. 93, ¶ 6.)  "A&F did not engage in any advertising of 'The Fitchuation' t-shirt

18

and only placed the t-shirt in its stores and listed it as a product on its website."  (Id. ¶ 7.) Therefore, the only similarity in the advertising channels used by the parties is their maintenance of websites on the Internet.  "This similarity would dispel rather than cause confusion, however, because the websites are separate and distinct, suggesting two completely unrelated business entities." Tana, 611 F.3d at 778. This factor weighs in favor of A&F.

### f.    Defendants' Intent (Factor Six)

Factor six considers whether the defendants had the intent to misappropriate the plaintiffs' goodwill.  See Jordashe Enters., 828 F.2d at 1486; see Lyons, 179 F.3d at 38 (rejecting argument that defendant "intended to profit," as "even at its inception, [the use] was clearly meant as a parody").  "When analyzing an alleged infringer's intent, [the Court] must determine whether the defendant 'adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation.'" Caliber, 605 F.3d at 940 (quoting Frehling Enters., 192 F.3d at 1340).  Without citing any case law and without distinguishing the defendants' cited authority, the plaintiffs argue that the trier of fact needs to weigh and consider each side's version of events to determine the defendants' true intent because an infringer rarely admits that it acted with intent. Response p. 13 (DE# 100, 11/20/12).  The plaintiffs rely generally on opinion testimony of David Feldman (plaintiffs' entertainment lawyer) and their expert, Dr. Lancaster.

In Jordache, the court explained that "where a party chooses a mark as a parody of an existing mark, the intent is not necessarily to confuse the public but rather to amuse." Jordashe Enters., 828 F.2d at 1486 (citing Note, *Trademark Parody: A Fair Use and First*

*Amendment Analysis,* 72 Va. L. Rev. 1079, 1079-80 n.4 (1986) (the purpose of a parody is "to create a comic or satiric contrast to a serious work").  A&F maintains that it intended to parody "The Situation," and clearly and conspicuously labeled its product as A&F. (SUMF ¶¶ 4, 10; Ex. H).  "The benefit to one making the parody, however, arises from the humorous association, not from public confusion as to the source of the marks.  A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect." Jordashe Enters., 828 F.2d at 1486.  "'No one likes to be the butt of a joke, not even a trademark.  But the requirement of trademark law is that a likely confusion of source, sponsorship or affiliation must be proven, which is not the same thing as a "right" not to be made fun of.'"  Id.(quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 31:38 at 670 (2d ed. 1984)).  In Jordashe,  the court held that the intent to parody an existing trademark did not support an inference of a likelihood of confusion under the reasoning that one who chooses a mark similar to an existing mark intends to confuse the public.  Id.  The court found that "[a]n intent to parody does not equal an intent to confuse the public." Id.  The undersigned agrees that A&F's "The Fitchuation" t-shirt constitutes a parody that is a play on words of a public figure -- Sorrentino's nickname, "The Situation," and "Fitch" as explained by Mr. Wilson.  (SUMF ¶ 4). See Cardtoons, L.C. v. Major League Baseball Players Assoc., 95 F.3d 959, 972 (10th Cir. 1996) ("[A] parody of a celebrity does not merely lampoon the celebrity, but exposes the weakness of the idea or value that the celebrity symbolizes in society.")  "[U]se of celebrity names or likenesses in parodies in general ... are not likely to confuse or deceive customers."  Id. at 975.  The shirt contains the defendants' mark, "Fitch" and bears the A&F brand label.  This factor weighs in favor of A&F.

20

### g.    Actual Confusion in the Consuming Public (Factor Seven)

The Eleventh Circuit has "routinely 'weighed' the likelihood-of-confusion factors on summary judgment" and has affirmed summary judgment where there was little evidence of actual confusion.  Tana, 611 F.3d at 774, 775 n.7 (citations omitted).  "Although likelihood of confusion is a question of fact, it may be decided as a matter of law." Id.  n. 7 (citing  Welding Servs., 509 F.3d at 1360).  The most persuasive evidence in assessing likelihood of confusion is actual confusion in the consuming public.  Tana, 611 F.3d at 779 (citing Alliance Metals, 222 F.3d at 907).  To evaluate actual confusion, the Court considers "not only ... the existence but also ... the extent of such confusion."  Id. (citing Welding Servs., 509 F.3d at 1360).  "Perhaps as important as . . . the number of instances of confusion are the kinds of persons confused and degree of confusion."  Caliber, 605 F.3d at 936.  "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight while confusion of actual customers of a business is worthy of substantial weight." Id. (citing Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1167 (11th Cir. 1982); Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1239-40 (11th Cir. 2008)).  In addition, "actual consumer confusion is the best evidence of likelihood of confusion."  Id. (quoting AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1543 (11th Cir. 1986) (citing  Lone Star, 122 F.3d at 1382)).  "[C]onsumers of the relevant product or service, especially the mark holder's customers, turn the key."  Id. (citing Alliance Metals, 222 F.3d at 908;  Safeway Stores, 675 F.2d at 1167; Custom Mfg., 508 F.3d at 650).  "All potential consumers of the relevant product or service, including middlemen, can inform the inquiry, and the ultimate consumers deserve special attention." Id. at 936-37 (citing John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 979 & n.22

(11th Cir. 1983)). "[T]here 'is no absolute scale as to how many instances of actual confusion establish the existence of that factor . . . . [T]he court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved.'" Id. at 937 (quoting AmBrit, Inc., 812 F.2d at 1543). "Similarly, . . . merely one instance of actual confusion [does] not militate in favor of finding likelihood of confusion." Id. (citing Frehling Enters., 192 F.3d at 1341). However, "'the quantum of evidence needed to show actual confusion is relatively small.'" Id. (quoting Jellibeans, 716 F.3d at 845).

The plaintiffs concede that there has not been any third party anecdotal instance of actual confusion. (SUMF ¶¶ 12-13). The defendants argue that the plaintiff cannot overcome the lack of evidence with the fatally flawed survey proffered by Ms. Lancaster, which is the subject of the defendants' Daubert motion to exclude the testimony of Professor Alyse Lancaster (DE# 89, 10/29/12). See Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 488 (5th Cir. 2004)(finding defective survey cannot raise issue of fact to overcome summary judgment). "A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." Id. (citing Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 118 (2d Cir. 1984) (holding that "Universal's survey [was] so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"). The Court finds that Dr. Lancaster's survey is not reliable under Daubert and rejects it.[12] The defendants' motion to exclude Dr. Lancaster's expert opinion testimony

---

[12]Prof. Lancaster concedes that she is not an expert in Lanham Act or likelihood of confusion surveys. The plaintiffs do not deny that her survey violates fundamental principles of reliability by planting the notion of infringement through closed-ended questioning without any directive not to speculate, failing to include any control

is granted.

The record lacks evidence of actual confusion. The undersigned finds that the plaintiffs have failed to present a triable issue of fact as to whether the defendants' "The Fitchuation" t-shirt was likely to confuse consumers into believing that the shirt came from the plaintiff rather than A&F.  Additionally, the plaintiffs did not satisfy their burden of showing that they had valid rights to "The Situation" as a trademark covering apparel at the time that A&F introduced its "The Fitchuation" t-shirt. (SUMF ¶ 64); see Tally-Ho Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022 (11th Cir. 1990)("[T]rademark rights are appropriated only through actual prior use in commerce."); Investacorp, 931 F.2d at 1522 (trademark interest is derived when a business uses a mark  "to represent its services"). The plaintiffs concede that they did not use "The Situation" on apparel and thus did not develop any common law rights to "The Situation" for apparel until June of 2010 at the earliest, which was several months after A&F introduced the t-shirt. (SUMF ¶¶ 9, 2, 61). No evidence in the record exists to show that the plaintiffs developed rights to "The Situation" as a trademark for entertainment services until after A&F introduced the shirt. (SUMF ¶¶ 58-59, 2).  Finally, the *post hoc* acquisition of an upside-down, stylized Situation & Design trademark that is dissimilar from the alleged "The Situation" word trademark was invalid because the plaintiffs do not offer the retail store services covered by the acquired registration and the plaintiffs concede they have never used the upside-down trademark. (SUMF ¶¶ 67-68); see Sugar Busters LLC v. Brennan, 177 F.3d 258, 265-66 (5th Cir.

---

whatsoever, and otherwise failing to comply with the Reference Guide on Survey Research or to case law evaluating Lanham Act surveys under *Daubert*. Defendants' Reply in support of its motion to exclude expert testimony under *Daubert*  (DE# 104, p. 5, 11/26/13).

1999)(finding assignment invalid where the plaintiff's sale of some books bearing the assigned mark over the Internet were not sufficiently similar to assigned registration covering retail store services). The defendants are entitled to judgment as a matter of law on the plaintiffs' trademark infringement claim as to "The Fitchuation" t-shirt.

### 2.    Press Release

The plaintiffs allege trademark infringement on the ground that the press release constituted a false and deceptive publicity campaign that allowed the defendants to profit off of the use of a false affiliation with Sorrentino and that the defendants wrongly used Sorrentino's name, image and likeness for advertising purposes in violation of applicable law.  Second Amended Complaint, ¶ 31 (DE# 68, 6/15/12).  The defendants maintain that reference to Sorrentino in their press release was non-actionable nominative fair use under trademark infringement law.[13] See Int'l Stamp Art, Inc. v. U.S. Postal Serv., 456 F.3d 1270, 1277 (11th Cir. 2006) (affirming summary judgment). The plaintiffs rely on the testimony of the plaintiffs' entertainment lawyer (Mr. Felman), Sorrentino's agent (Mr. Kagan) and their expert, Dr. Lancaster.

The use of a plaintiff's alleged trademark for purposes of expression, criticism, commentary or satire is generally protected as a matter of law unless it explicitly misleads

---

[13] Sub-section 1125(c)(3)(A) of Title 15 of the United States Code expressly excludes any claim of dilution by blurring or dilution by tarnishment based upon "[a]ny fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with – (i) advertising or promotion that permits consumers to compare goods or services; or (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.  15 U.S.C. § 1125(c)(3)(A).

as to source or sponsorship.  See Univ. of Ala. Bd. of Trs. v. New Life Art, Inc., 683 F.3d 1266, 1278-79, 1282 (11ᵗʰ Cir. 2012).  Courts have repeatedly dismissed trademark infringement claims where the challenged communication contained criticism or made fun of the plaintiff.  See Lamparelli, 420 F.3d at 314-15 ("No one would believe Reverend Falwell sponsored a site criticizing himself).  The plaintiffs do not deny that the August 15, 2011 press release, in criticizing the plaintiff Michael Sorrentino, could not possibly have created a likelihood of confusion that the press release was issued or approved by Sorrentino.  The plaintiffs concede that A&F's press release responded to the plaintiff Sorrentino's wearing its brand on *The Jersey Shore* (Defendants' Motion, Ex. 1:271:20-23; Ex. 8: 381:8-382:17).  Additionally, the plaintiffs concede that the  press release does not propose a commercial transaction to consumers.  (SUMF ¶¶ 46, 43-45 (citing Michael Sorrentino Depo.)).  The plaintiffs cannot avoid the law and this admission by pointing to the undisputed fact that boilerplate company background appeared below the text of the press release.  (SUMF ¶  24).

"[O]ne can use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product."  Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 545 (5ᵗʰ Cir. 1998) (citations omitted).  "[W]here a nominative use of a mark occurs without any implication of affiliation, sponsorship or endorsement – i.e. likelihood of confusion – the use 'lies outside the strictures of trademark law." Id. (quoting New Kids on the Block v. New America Pub., Inc., 971 F.2d 302, 308 (9ᵗʰ Cir. 1992), cited with approval in Int'l Stamp Art, Inc. v. U.S. Postal Serv., 456 F.3d 1270, 1277 (11ᵗʰ Cir. 2006) (classic fair use case) (affirming summary judgment)); see Suntree Techs., Inc. v. EcoSense Int'l, Inc., 802 f. Supp. 2d 1273, 1282 (M.D. Fla. 2011), aff'd, 693

F.3d 1338, 1346 (11th Cir. 2012).

The Court finds that the use of Michael Sorrentino's name and nickname in the press release was a non-actionable fair use under trademark law.  A&F used only so much of the plaintiff's name as was reasonably necessary to respond to his wearing A&F's brand on *The Jersey Shore* (SUMF ¶¶ 15, 20-22), and did not do anything that would suggest Sorrentino's sponsorship or endorsement.  (SUMF ¶¶ 23, 28-29, 32, 42) A&F's press release expressly disassociated Sorrentino from A&F, and the plaintiffs have conceded that no third party has expressed any confusion that the press release rejecting Sorrentino's image somehow suggested sponsorship or endorsement by Sorrentino. (SUMF ¶¶ 23, 32).  **Because the Court finds that the press release is not an advertisement as a matter of law, the opinions of Messrs. Feldman and Kagan, and Dr. Lancaster to suggest otherwise do not create a genuine issue of material fact to defeat summary judgment.[14] <u>See</u>, *infra,* p. 28-29.**  Accordingly, the defendants are entitled to summary judgment on the plaintiff's claim of trademark infringement based on the purported advertising campaign, particularly the press release.

### B.    "Right of Publicity" Claim under Fla. Stat. § 540.08

In response to a question certified by the Eleventh Circuit, the Supreme Court of Florida considered whether Section 540.08(1) of the Florida Statutes prohibits publications "which do not directly promote a product or service," and answered the certified question

---

[14]Even if the Court were required to consider the opinions of these plaintiffs' witnesses as to the defendants' intent in issuing the press release as a form of advertisement, the Court finds that their opinions fail to satisfy *Daubert* and the plaintiff failed to meet the expert disclosure requirements of the Federal Rules of Civil Procedure regarding Messrs. Feldman and Kagan.

in the negative.  Tyne, 901 So.2d at 805, 809.  Section 540.08(1) provides that

> No person shall publish, print, display or publicly use for purposes of trade
> or for any commercial or advertising purpose the name, portrait, photograph
> or other likeness of any natural person without the express written or oral
> consent to such use given" by such person.

Fla. Stat. § 540.08(1).  In Tyne, the court approved the decision in Loft v. Fuller, 480

So. 2d 619, 623 (Fla. 4th DCA 1981) that a reference to a plaintiff is not actionable

"simply because it is included in a publication that is sold for profit."  Tyne, 901 so. 2d at

806-07, 809.  Additionally, the Supreme Court of Florida approved the district court's

holding that "[m]erely using an individual's name or likeness in a publication is not

actionable under § 540.08."  Id. at 805-06.  The Eleventh Circuit has emphasized that

"barr[ing] the use of people's names" in such a "sweeping fashion" would raise "grave

questions" of constitutionality, as "the right of publicity has not been held to outweigh

the value of free expression."  Valentine, 698 F.2d at 433 (affirming as a matter of law

that use was not commercial use), cited with approval in Tyne, at 806-07, 810 (citations

omitted).

Reviewing case law under the statute, the court determined that "the purpose of

section 540.08 is to prevent the use of a person's name or likeness to directly promote

a product or service *because of the way* that the use associates the person's name or

personality *with something else.*"  Id. (citing Loft, 408 So. 2d at 622) (emphasis

supplied); see Valentine, 698 F.2d at 433 (communication must "directly promote" a

product or service to be actionable) (finding no violation where challenged content

described true events in which the plaintiff participated).  Courts in the Eleventh Circuit

have dismissed Section 540.08 claims by summary judgment on the ground that the

27

challenged communication did not "directly" promote a product or service even where

the defendant included the plaintiff's name on the very product it advertised and sold.

See Faulkner Press, LLC v. Class Notes, LLC, 756 F. Supp. 2d 1352, 1360 (N.D. Fla.

2010) (professor's name used on the class note product itself); Tyne, 901 So.2d at 807

(citing Valentine, 698 f.2d at 433; Lane v. MRA Holdings, LLC, 242 F. Supp. 2d 1205,

1212-14 (M.D. Fla. 2002)).

The plaintiffs' claim that the press release violated Section 540.08 fails as a

matter of law.  The press release did not directly promote a product or service but, as

the plaintiffs concede, responded to Sorrentino's wearing A&F's brand.  (SUMF ¶¶ 43-

46, 15, 20).  The boilerplate language at the bottom of the press release that merely

identifies the defendants' stores and websites cannot be construed to directly promote

a good or service.[15]    The press release did not associate the plaintiff's name "with

something else."  See Fla. Stat. § 540.08.  The press release explicitly attempted to

disassociate the plaintiff's name from the brand that he chose to wear on *The Jersey*

*Shore* in front of millions of viewers. (SUMF ¶¶ 23, 27, 34-37-41-42, 47-54).  The press

release contains opinions and one true statement of fact that an offer was made.  The

basis of the plaintiffs' misleading advertising claim is that the press release constitutes

an advertisement because it contains standard boilerplate language at the bottom that

identifies the number of the defendants' stores and websites and generated newspaper

---

[15] The press release is more akin to a cease and desist letter than an
advertisement.  See Clearplay, Inc. v. Nissim Corp., 555 F. Supp.2d 1318, 1330-31
(S.D. Fla. 2008) (press release in the context of patent infringement) ("Communication
of accurate information about patent rights, whether by direct notice to potential
infringers or *by publicity release*, does not support a finding of bad faith.").

articles, Internet stories and blog posts.  Notably the press release does not identify any particular product.

The plaintiffs' reliance on articles and Facebook comments that A&F's press release was a publicity stunt is inadmissible hearsay, which this Court will not consider. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[I]nadmissible hearsay cannot be considered on a motion for summary judgment," unless it would be submitted in trial in an admissible form). Likewise, the plaintiffs' reliance on their entertainment lawyers' opinions and arguing that "[n]obody would understand the [supposed] damage to Sorrentino better than his transactional attorney" cannot defeat summary judgment. See U.S. v. Frazier, 387 F.3d 1244, 1296 (11th Cir. 2004) ("[N]othing ... requires a district court to admit opinion evidence that is connected to existing data only by the [bare assertion] of the expert.") (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Court finds that the defendants are entitled to judgment as a matter of law on the plaintiffs' "right of publicity" claim under Fla. Stat. § 540.08.

**C.     False Advertising Claim Under the Lanham Act (15 U.S.C. § 1125(a))**

The plaintiffs have not shown any *material, false or misleading* representation of fact as required for a false advertising claim in the Eleventh Circuit.  Whether the challenged statement is one of actionable fact or non-actionable opinion is essential to any false advertising claim under the Lanham Act.  Pizza Hut, Inc. v. Papa John's Intern., Inc., 227 F.3d 489, 495 (5th Cir. 2000) (In order to prevail, "a plaintiff must demonstrate that the commercial advertisement or promotion is either literally false, or that [if the advertisement is not literally false,] it is likely to mislead and confuse

29

customers." ).  "A Lanham Act false advertising claim arises when '[a]ny person who, on or in connection with any goods . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods[.]'"  <u>Natural Answers, Inc. v. SmithKlineBeecham Corp.</u>, 529 F.3d 1325, 1330 (11th Cir. 2008) (quoting 15 U.S.C. § 1125(a)).  "The intent of this provision is to protect 'commercial interests [that] have been harmed by a competitor's false advertising, and [to secure] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'" <u>Natural Answers</u>, 529 F.3d at 1330-31 (alterations in original) (quoting <u>Phoenix of Broward, Inc. v. McDonald's Corp.</u>, 489 F.3d 1156, 1168 (11th Cir. 2007)).

"In order for representations to constitute 'commercial advertising or promotion' under Section 1125(a), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." <u>Suntree Technologies, Inc. v. Ecosense Int'l</u>, 693 F.3d 1338, 1349 (11th Cir. 2012) (citation omitted) (quotation omitted).  "While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."  <u>Id.</u> (quotation omitted).

The plaintiffs base their false advertising claim on statements of opinion that cannot be proven true or false:

A&F's "deep[ ] *concern*[ ] that Mr. Sorrentino's association with our brand could cause significant damage to our image," and A&F's *belief* [that] this association is contrary to the aspirational nature of our brand, and may be distressing to many of our fans."

DE# 68-2 p.2, 68 ¶¶ 54, 60; Exs. C, 20).  A&F's offer of money for Sorrentino not to wear its brand is a statement of fact but is undisputedly true.  A&F's offer was sent and received prior to the issuance of A&F's press release as the plaintiffs' counsel acknowledged.  (SUMF ¶¶ 16, 18-19).  A&F's letter actually states that A&F "would be willing to pay MTV or Mr. Sorrentino or other characters," and Michael Sorrentino concedes this is an offer.  (SUMF ¶¶ 16-17, 30-31; EX. A; Ex. 8: 418:7-19, 421:8-12, 15-21); see Lipscher v. LRP Publications, Inc., 266 F.3d 1305, 1314 (11th Cir. 2001) (granting judgment as a matter of law because the plaintiff failed to present any evidence of falsity).  Even if a court deems an ad to be true but misleading, the plaintiffs must show evidence of deception.  Johnson & Johnson Vision Care v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).  Here, the plaintiffs did not show any evidence of consumer deception.  The defendants are entitled to judgment as a matter of law on the plaintiffs' false advertising claim.

### D.      Unfair Competition under Fla. Stat. § 495.151

Section 495.151 of the Florida Statutes establishes a cause of action for trademark dilution.  To prevail on a trademark dilution claim, the plaintiffs must plead and prove the following: "'1) the plaintiffs' mark is famous; 2) the defendants used the plaintiffs' mark after the plaintiffs' mark became famous; 3) the defendants' use was commercial and in commerce; and 4) the defendants' use of the plaintiffs' mark has likely caused dilution.'"  Z Prod., Inc. v. SNR Prod., Inc., 2011 WL 3754693, *5 (M.D.

Fla. 2011) (quoting RainBird Corp. v. Taylor, 665 F. Supp. 2d 1258 (N.D. Fla. 2009)

(citing Great Southern Bank v. First Southern Bank, 625 So. 2d 463, 471 (Fla. 1993)).

Under Florida law, the plaintiff must also produce proof that the use of a trademark

decreases the plaintiff's commercial value.  See Freedom Sav. and Loan Ass'n v. Way,

757 F.2d 1176, 1186 (11th Cir. 1985).

"Courts may use an analysis of federal infringement claims as a 'measuring stick'

in evaluating the merits of state law claims of unfair competition."  Planetary Motion,

Inc. v. Techsplosion, 261 F.3d 1188, 1193 n.4 (11th Cir. 2001)(citing Investacorp, Inc. v.

Arabian Inv. Banking Corp., 931 F.2d 1519, 1521 (11th Cir. 1991)).  Where, as here, the

plaintiffs have failed to establish a claim for federal trademark infringement and unfair

competition, related state law claims likewise fail. See  Investacorp, 931 F.2d at 1521.

To be "famous" in the context of a trademark dilution claim, "[t]he mark must

have a degree of distinctiveness and strength beyond that needed to serve as a

trademark; it must be 'truly prominent and renowned.'" HBP, Inc. v. American Marine

Holdings, Inc., 290 F. Supp. 2d 1320, 1338 (M.D. Fla. 2003) (citation omitted).  Even if

the Court were to deem the plaintiffs' mark famous, A&F presented "The Fitchuation" t-

shirt several months *before* the plaintiffs had a trademark registration for apparel.

Although the defendants' use was in commerce, the plaintiffs have failed to present

evidence that the defendants' parody likely caused dilution or decreased the plaintiffs'

commercial value.  (SUMF ¶ 14); Jordashe Enters., 828 F.2d at 1487, 1489-90. The

plaintiffs' dilution claim under Fla. Stat. § 491.151 fails and the defendants are entitled

to judgment as a matter of law.

### E.  Injury to Business Reputation under Fla. Stat. § 491.151

An injury to business reputation claim is subsumed within Fla. Stat. § 491.151,

already alleged in Count IV, for which the plaintiffs fail to show a triable claim as

discussed above.  (SUMF ¶ ¶14, 69); see Tally-Ho, 889 F.2d at 1024 (Section 495.151

"permits any trademark owner, whether registered or unregistered, to prohibit either a

non-competitor's or competitor's use of a similar mark *if there is a likelihood of injury to*

*business reputation* or dilution of the mark's distinctive quality") (emphasis added).  The

plaintiffs' allegations consist of the same conduct alleged under its trademark claims

that is confusion as to business affiliation or approval or the origin of the plaintiffs'

goods. (Compare DE# 68 ¶ 77 to ¶¶ 40, 48).  Thus, summary judgment is warranted.

See Freedom Savings, 757 F.2d at 1186 (no unfair competition where the plaintiff did

not complain of conduct not already considered in infringement claim).

**F.     Misleading Advertising Claim under Fla. Stat. § 817.41**

To prove a violation of Florida's misleading advertising statute, the plaintiffs must

show reliance on the alleged misleading advertising as well as each of the other

elements of the common law tort of fraud in the inducement.  Smith v. Mellon Bank, 957

F.2d 856 (11th Cir. 1992) (citing Vance v. Indian Hammock Hunt & Riding Club, Ltd.,

403 So. 2d 1367, 1370 (Fla. 4th DCA 1981).  The plaintiffs' response does not address

their misleading advertising claim under Fla. Stat. § 817.41.   In any event, the plaintiffs

have not proven any false statement and have not shown reliance by them or any

consumers on A&F's press release. (SUMF ¶¶ 28-29, 32-33, 69  See Hill

Dermaceuticals, Inc. v. Rx Solutions, 306 Fed. App'x 450, 454-55 (11th Cir. 2008)

(unpublished) (affirming dismissal of advertising claim in absence of any false

statement); <u>Kramer v. Unitas</u>, 831 F.2d 994, 998-99 (11th Cir. 1987) (finding neither

defendant made any false statement).  Without evidence to prove the elements of fraud

and reliance, the misleading advertising claim under Florida law fails as a matter of law

and the defendants are entitled to summary judgment.

**V.** **Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that, as consistent with this

Order:

**1.** Defendants' Motion for Summary Judgment (DE# 93, 11/1/12) is

**GRANTED**;

**2.** All pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this <u>28th</u> day of June,

2013.

**JOHN J. O'SULLIVAN**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:

Counsel of Record